IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01625-GPG-KAS

RODNEY DOUGLAS EAVES,

      Plaintiff,

v.

LARRY COX, Chief of Security at Bent County Correctional Facility,
ROSCOE MUELLER, Chief of Programs at Bent County Correctional Facility,
JESSICA GARCIA, Legal Liaison at Bent County Correctional Facility,
MARSHALL GRIFFITH,
VIRGIL ENSEY,
ADRIENNE JACOBSON,
DEAN WILLIAMS,
MOSES ANDRE STANCIL,
DAVID HESTAND,
KERRI DELAROSA,
A. SALAS,
COLIN CARSON,
SANDRA BROWN,
STACEY LEWIS,
STEVEN SALAZAR,
TIFFANY SALDANA,
HOWELL, Mr., and
VANDYKE, Mr.,

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

      This matter is before the Court on the **Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 10) Pursuant to Fed. R. Civ. P. 12(b)(6)** [#34][1] (the "CDOC

---

[1] "[#34]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Recommendation.

Motion"), filed by Defendants Marshall Griffith ("Griffith"), Adrienne Jacobson ("Jacobson"),[2] Dean Williams ("Williams"), Moses Andre Stancil ("Stancil"), Kerri Delarosa ("Delarosa"), and Mr. Vandyke ("Vandyke") (collectively, the "CDOC Defendants"); and on the **Motion to Dismiss** [#37] (the "BCCF Motion"), filed by Defendants Larry Cox ("Cox"), Roscoe Mueller ("Mueller"), Jessica Garcia ("Garcia"), Virgil Ensey ("Ensey"), David Hestand ("Hestand"), A. Salas ("Salas"), Colin Carson ("Carson"), Sandra Brown ("Brown"), Stacey Lewis ("Lewis"), Steven Salazar ("Salazar"), Tiffany Saldana ("Saldana"), and Mr. Howell ("Howell") (collectively, the "BCCF Defendants"). Plaintiff, who proceeds in this matter as a pro se litigant,[3] filed Responses [#61, #77] in opposition to the Motions to Dismiss [#34, #37], Defendants filed Replies [#66, #83], and Plaintiff filed a Surreply [#87], with permission of the Court. The Motions to Dismiss [#34, #37] have been referred to the undersigned pursuant to 28 U.S.C. § 636(b), Fed. R. Civ. P. 72, and D.C.COLO.LCivR 72.1. *See* [#38, #67]. The Court has reviewed the briefs, the entire case file, and the applicable law. Based on the following, the Court **RECOMMENDS** that the CDOC Motion [#34] and the BCCF Motion [#37] both be **GRANTED in part** and **DENIED in part**.

---

[2] Defendant Jacobson is now named Adrienne Sanchez. *CDOC Motion* [#34] at 1 n.1. However, for ease of reference in connection with the allegations in Plaintiff's Amended Complaint [#10], the Court refers to Ms. Sanchez as Defendant Jacobson through this Recommendation.

[3] The Court must liberally construe a pro se litigant's filings. *See Haines v. Kerner*, 404 U.S. 519, 520-521 (1972). In doing so, the Court should neither be the pro se litigant's advocate nor "supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1175 (10th Cir. 1997) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).

## I. Background

Plaintiff is a convicted and sentenced state prisoner in the custody of the Colorado Department of Corrections ("CDOC"). *See Am. Compl.* [#10] at 2.[4] At all times relevant to this lawsuit, he was held at the Bent County Correctional Facility ("BCCF"), although he has since been transferred to the Sterling Correctional Facility ("SCF"). *See Notices of Change of Address* [#7, #53]. His sprawling, 405-paragraph Amended Complaint [#10][5] names eighteen Defendants, all of whom are officers or staff members of CDOC generally or BCCF specifically. Plaintiff sues BCCF Defendants Cox, Mueller, Garcia, Ensey, Hestand, Salas, Carson, Brown, Lewis, Salazar, Saldana, and Howell and CDOC Defendants Jacobson and Williams in their individual capacities only.[6]  *See Am. Compl.*

---

[4] For the purpose of resolving the Motions [#34, #37], the Court accepts as true all well-pleaded, as opposed to conclusory, allegations made in Plaintiff's Amended Complaint [#10]. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007). To the extent that Plaintiff adds new facts or theories of recovery in his Responses [#61, #77], it is well-established that a plaintiff "cannot amend [his] complaint by adding factual allegations in response to [a d]efendant's motion to dismiss." *Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015). The Court further notes that, while a Rule 12(b)(6) motion should generally be converted to a summary judgment motion if the court considers materials outside the pleadings, three exceptions exist: (1) "documents that the complaint incorporates by reference"; (2) "documents referred to in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity"; and (3) "matters of which a court may take judicial notice." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citations and internal quotations omitted). For the most part, the documents Plaintiff attaches to his Responses [#61, #77] either may not be considered under this standard or else are immaterial to adjudication of the Motions [#34, #37].

[5] The Court cites paragraph numbers in the Amended Complaint [#10] where cited information can be found therein; otherwise, for cited information not contained within numbered paragraphs, the Court cites the page number of the Amended Complaint [#10].

[6] Plaintiff originally sued Defendant Williams in both his individual capacity and official capacity, but he later edited his Amended Complaint to remove the official capacity reference. *See* [#10] at 8. However, perhaps by oversight, later in the Amended Complaint, he states that he seeks relief against Defendant Williams in both capacities. *See id.* at 38. Regardless, Defendant Williams is no longer the Executive Director of CDOC, so, pursuant to Fed. R. Civ. P. 25(d), his successor, Defendant Stancil, is automatically substituted in his place with respect to any official-capacity claims. *See CDOC Motion* [#34] at 9 n.3; Fed. R. Civ. P. 25(d) (stating that, "when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending[,] [t]he officer's successor is automatically substituted as a party").

[#10] at 2-3, 7-9. He sues the other four CDOC Defendants, i.e., Griffith, Stancil, Delarosa, and Vandyke, in both their individual and official capacities. *Id.* at 7-8, 10. Plaintiff divides his allegations into four "claims," although each claim incorporates multiple incidents and constitutional amendments.

**A.    Claim One (Denial of Access to Courts)**

Claim One is asserted against CDOC Defendants Griffith, Jacobson, Williams, Stancil, and Vandyke and BCCF Defendants Cox, Mueller, Garcia, Ensey, Brown, Salazar, Saldana, and Howell. *Am. Compl.* [#10] at 4. Plaintiff claims that these Defendants have violated his First and Fourteenth Amendment rights based on their denial of his access to the courts. *Id.*

Defendant Cox is BCCF's Chief of Security, and Defendant Mueller is BCCF's Chief of Programs. *Id.* at 2-3. Plaintiff alleges that he was "subjected to restrictions that deny [him] access to the facilities [sic] law library by [Defendants] Cox and Mueller for no justified reason," while other inmates were allowed to access the law library. *Id.* ¶¶ 1-2.

Defendant Garcia is BCCF's Legal Liaison. *Id.* at 3. Plaintiff alleges that he "attempted to obtain documentation from [Defendant] Garcia to support [his] step 3 grievance for denied access to the law library," but "she denied the requested information" because she "was instructed by [Defendant] Cox not to provide it." *Id.* ¶¶ 8-9. Plaintiff claims that Defendants Cox and Garcia denied him access to the law library sign in sheet, "which would have shown overseers [Defendants] Griffith, Ensey, Jacobson, Williams and Stancil . . . that while other inmates were allowed to go to the law library, [Plaintiff] was denied because of a 'security reason.'" *Id.* ¶ 12. (Defendant Griffith is a CDOC Grievance Officer, Defendant Ensey is BCCF's Warden, Defendant Jacobson works for CDOC legal

services, and Defendants Williams and Stancil are the former and current CDOC Executive Directors, respectively. *Id.* at 7-8.) Plaintiff asserts that this conduct prejudiced him around September and October 2022 in an earlier-filed case in this Court, *Eaves v. Polis*, Case No. 21-cv-01269-KLM (D. Colo.), when the Court struck one of his filings—a surreply filed without leave of the Court—and ordered him to show "why a surreply is appropriate in this case."[7] *Id.* ¶¶ 15-23.

On January 15, 2023, a fight broke out at BCCF involving the Blood gang. *Id.* ¶¶ 26-27. Plaintiff claims that his law library privileges were restricted due to that fight even though he "had nothing to do with [it]" and even though some Blood gang associates were not restricted from accessing the law library. *Id.* ¶¶ 35-38. The lockdown lasted for two weeks. *Id.* ¶ 44. Plaintiff filed a grievance, to which Defendant Griffith did not respond for three months, well after the lockdown ended. *Id.* ¶¶ 39-41. Plaintiff claims that he was again placed on lockdown on February 24, 2023, "for something [he] had nothing to do with." *Id.* ¶ 45. He sent a kite to a Ms. Sanchez[8] "notifying her that [he] would be on lock down again for another two weeks" and requesting access to a computer to finish typing a Rule 35(c) post-conviction motion, which she said she could not do during lockdown, although she offered to "bring supplies and provide copies as needed." *Id.* ¶¶ 46-47. Plaintiff asserts that Defendants Cox, Mueller, and Ensey developed informal policies

---

[7] After the events described by Plaintiff, this case was reassigned to the undersigned and redesignated as Case No. 21-cv-01269-KAS. The Court uses this current designation throughout the remainder of this Recommendation.

[8] This appears to be a different person than Defendant Jacobson, who is now known as Adrienne Sanchez, given Plaintiff's consistent use of "Jacobson" elsewhere in his Amended Complaint [#10]. *See CDOC Motion* [#34] at 2 n.2 ("Upon information and belief, this is not the same person as Adrienne Sanchez, who is a defendant in this lawsuit, as [Plaintiff] refers to Defendant Sanchez exclusively as 'Jacobson.'").

outside of CDOC, hiding behind "security reasons" to deny him access to the courts while allowing other inmates to violate directives. *Id.* ¶¶ 50, 54. Another lockdown occurred on June 28, 2023, purportedly due to too much "hooch" (i.e., homemade alcohol) found in Plaintiff's unit. *Id.* ¶ 55. Plaintiff asked a non-party, Lieutenant Archuleta, whether there was a legitimate security reason for the lockdown and Lieutenant Archuleta allegedly said no—it had been ordered by Defendants Cox and Ensey. *Id.* ¶ 56.

From June 28, 2023, to July 10, 2023, Plaintiff was denied access to the law library and to his case manager, so he could not turn in a step 3 grievance relating to BCCF's denial of discovery in his criminal case. *Id.* ¶ 58. Plaintiff states that Defendants Cox and Ensey also changed the policy that had allowed him to access the legal mail window during lunch on weekdays, instead allowing access only if he sends a paper kite through the mail system. *Id.* ¶¶ 59-61. He claims that denying him access to the law library while others have access violates his constitutional rights. *See, e.g.*, *id.* ¶¶ 66, 68.

Defendant Saldana is an administrative clerk at BCCF, Defendant Salazar is BCCF's Head of Programs,[9] and Defendant Howell is BCCF's Principal of Education. *Id.* at 9. Plaintiff alleges that, on August 9, 2023, his digital legal documents were taken by Defendant Saldana, even though CDOC's Administrative Regulations ("ARs") allow him to keep up to twenty legal documents in his computer profile.[10] *Id.* ¶¶ 70-73. Defendants

---

[9] The Amended Complaint [#10] renders unclear whether "Head of Programs" and "Chief of Programs" are different positions. *See Am. Compl.* [#10] at 3 (naming Defendant Mueller as "Ch[ie]f of Programs at BCCF"), 9 (naming Defendant Salazar as "Head of Programs at BCCF").

[10] State administrative regulations, such as CDOC's ARs, are subject to judicial notice. *See, e.g.*, *Allen v. Clements*, 930 F. Supp. 2d 1252, 1259-61 (D. Colo. 2013) (taking judicial notice of CDOC's AR 700-19 and 700-32). For ease of reference, the CDOC Defendants have provided copies of certain relevant ARs. *See* [#34-1]. The Court cites specific ARs throughout this Recommendation, as needed.

Howell and Salazar were Defendant Saldana's supervisors, and they allowed her to remove the files. *Id.* ¶¶ 74-75. The file removal was prompted by a modification to the contract that governed BCCF inmates' use of the law library. *Id.* ¶¶ 76-82. Around that time, Plaintiff's allowable law library appointment time was reduced from three-and-a-half hours to an hour and fifteen minutes, and he could not save documents or print them unless they were complete. *Id.* ¶¶ 83-84. Plaintiff raised concerns with Defendant Vandyke, who told him that Defendants Saldana, Salazar, and Howell were following CDOC policy. *Id.* ¶¶ 85-87. (Defendant Vandyke is part of CDOC's "Private Prison Monitoring Unit ('PPMU')." *Id.* at 10.). A week after Plaintiff had his mother email Defendant Jacobson (of CDOC's legal services) about these issues, he was transferred from BCCF. *Id.* ¶¶ 88-89.

Defendant Brown is BCCF's Mailroom Manager and Head of Reading Committee. *Id.* at 9. Plaintiff alleges that during his time at BCCF, Defendant Brown denied him access to two CDs of discovery from confidential criminal investigations in his state court criminal case because they were "not sent by the court or by a licensed attorney." *Id.* ¶¶ 96-97. Soon after, he was told by Defendant Brown that the CDs had been disposed of and that he could not come to the legal mail window without an appointment. *Id.* ¶ 100. After Plaintiff was transferred from BCCF, in August 2023, he received the documents that he had been told were destroyed. *Id.* ¶¶ 102-03. While reviewing them, Plaintiff alleges that he found a legal mail notice from a state district court, dated July 8, 2021, notifying him that he had 30 days to have someone pick up the evidence in his case or it would be destroyed. *Id.* ¶ 104. He believes that these events resulted in "destruction of the evidence that would support [his] innocence." *Id.* ¶ 113.

B.    **Claim Two (Excessive Lockdowns)**

Claim Two is asserted against CDOC Defendants Griffith and Jacobson and BCCF Defendants Cox, Mueller, and Ensey. *Id.* at 15. Plaintiff claims that these Defendants have violated his First, Eighth, and Fourteenth Amendment rights through the use of excessive lockdowns imposed at BCCF. *Id.*

Plaintiff alleges that, shortly after Defendant Cox became BCCF's Chief of Security in February 2020 and Defendant Mueller became BCCF's Chief of Programs, he "noticed changes in policy in contradiction to CDOC's policies." *Id.* ¶¶ 117-18. Plaintiff claims that between October 2016 and 2020, he only experienced about six lockdowns that lasted more than a week, with most lockdowns lasting less than twenty-four hours. *Id.* ¶ 125. Beginning in October 2021, Defendants Cox and Mueller imposed "at least 20 lockdowns lasting two or more weeks," with even "temporary lockdowns last[ing] 48 to 72 hours." *Id.* ¶ 126. During those lockdowns, Plaintiff lost video visits for which his family had paid; was denied showers, laundry services, commissary, and telephone communications; and his outgoing mail was not picked up. *Id.* ¶ 127. He was also denied access to the law library, recreation, and religious services. *Id.* Food would often sit undelivered for up to three hours, getting cold and sometimes resulting in dinner being delivered while lunch was still sitting undelivered. *Id.* ¶ 130.

Plaintiff claims that these lockdowns were imposed "for punishment of the prison population for various inciden[t]s" in which he had not personally participated. *Id.* ¶¶ 135-36. Before Defendant Cox took over, similar incidents had been resolved through other programs or by segregating those inmates from the general population. *Id.* ¶ 137. Plaintiff claims that these lockdowns caused him to lose privileges "as punishment without

receiving due process by Defendants Cox, Mueller and Ensey in violation of the Fourteenth Amendment." *Id.* ¶ 141. He alleges that these lockdowns also interfered with his First Amendment right to practice his religion by "tak[ing] off [his] boots and walk[ing] upon [his] Grandmother so [his] spiritual connection to her can be felt" and "cleans[ing] [his] spirit with sacred smoke." *Id.* ¶¶ 146-47. Plaintiff also could not contact his case manager. *Id.* ¶¶ 149, 151. After the Blood gang fight, Defendant Mueller allegedly admitted punitive intent, telling Plaintiff, "[Y]ou'll don't want to behave and the last lockdown of a week didn't work for you guys so we (Ensey and Cox) decided that we will continue to increase the lockdown until you guys learn." *Id.* ¶ 155.

## C.    Claim Three (Separation from Faith Circle and Denial of Faith Materials)

Claim Three is asserted against CDOC Defendants Griffith, Delarosa, Williams, and Stancil and BCCF Defendants Cox, Mueller, Ensey, Hestand, and Carson. *Id.* at 18. Plaintiff claims that these Defendants have violated his religious freedom rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the First Amendment, and the Fourteenth Amendment. *Id.*

Defendant Hestand is the chaplain at BCCF. *Id.* at 8. On May 11, 2022, Plaintiff "received a request from [Defendant] Hestand informing [him] of [his] separation of the Native American faith group ('Circle')." *Id.* ¶ 162. Plaintiff asserts that Defendants had no justifiable reason to separate him from the Circle and that they did so in retaliation for his claims against them in *Eaves v. Polis. Id.* ¶¶ 164-65.

Plaintiff alleges that being separated from the Circle prevents him from being prayed for or praying for others and causes him to consume ceremonial materials at a much faster rate. *Id.* ¶¶ 167-69. Separation also prevents him from carrying out his duties

as one of the Circle's faith leaders "such as collecting donations for materials, consulting members during difficult times, and helping with the construction of the Inipi, gathering firewood and water, walking with the fire, and cleaning and tending the faith grounds in order to have continuing ceremonies." *Id.* ¶ 171. On September 7, 2022, Plaintiff wrote two requests to attend a Change of Seasons ceremony with the whole Circle and, to address the BCCF Defendants' stated "security reasons," Plaintiff requested that staff be present with direct supervision during the ceremony. *Id.* ¶¶ 172-73. Although Plaintiff sent the request to Defendant Carson, Defendant Mueller intercepted it and "stated there would be two compounds and they would be separated." *Id.* ¶ 174. (Defendant Carson is an assistant warden at BCCF. *Id.* at 8.) In other words, although not entirely clear, Plaintiff appears to allege that he was personally separated from the Circle and then later that the rest of the Circle was divided by where the participants were housed.

On September 11, 2022, Plaintiff spoke to Defendant Mueller about why the Circle was being separated, and Defendant Mueller told Plaintiff that he, along with Defendants Cox and Ensey, "had determined that contraband and messages were being passed in all the faith groups." *Id.* ¶ 177. Mr. Mueller refused to reconsider and told Plaintiff he could just "file another lawsuit," referring to Plaintiff's other lawsuit against BCCF staff members over Native American religious rights. *Id.* ¶¶ 177-78.[11] On February 3, 2023, Plaintiff wrote a letter and handed it to Defendant Mueller, with copies for Defendants Carson and Delarosa, who did not intervene. *Id.* ¶¶ 181-82, 188. (Defendant Delarosa is CDOC's Faith and Citizen Coordinator. *Id.* at 8.) Plaintiff questions the BCCF Defendants' security

---

[11] At least five BCCF Defendants—though not Defendant Mueller—were named as Defendants in both this matter and *Eaves v. Polis*, including Defendants Hestand, Cox, Saldana, Salazar, and Carson. *See Am. Compl.* [#66] in *Eaves v. Polis*, No. 21-cv-01269-KAS (D. Colo. May 12, 2022).

rationale, as Catholic services were conducted with "a mixture of compound one and two without the same separation [Plaintiff] was being subjected to." *Id.* ¶ 187.

On March 29, 2023, Defendant Ensey told Defendant Hestand to inform Plaintiff that he "was no longer allowed to attend compound one's service in any capacity." *Id.* ¶ 192. Plaintiff asked Defendant Hestand to have Defendant Ensey send him something in writing to confirm the order, but Defendant Hestand later "stated Ensey said he did not have to give [Plaintiff] anything in writing that it was a direct order and if [Plaintiff] attended anymore religious services [he] would receive a COPD charge for failure to follow a direct order." *Id.* ¶¶ 194-95. Plaintiff believes that separation of the Circle "violates [his] First Amendment right to be one Circle according to [his] faith tenet" and that "the Circle is a connection to community and family." *Id.* ¶ 196.

Plaintiff also asserts that he is being denied faith materials. *Id.* at 21. On August 11, 2022, he submitted a request to order kinni-kinnick, "an herb and tobacco blend smoked during a prayer ceremony" preapproved by Defendant Hestand. *Id.* ¶¶ 197, 205. He alleges that "[a] prayer ceremony cannot be conducted without the Kinni-kinnick." *Id.* ¶ 207. On August 25, 2022, Defendant Hestand approved the request, but when Plaintiff placed an order with an approved vendor, Defendant Cox ordered Defendant Salas to deny it. *Id.* ¶¶ 198-200. (Defendant Salas is a mailroom operator at BCCF. *Id.* at 8.) Plaintiff then spoke to Defendant Carson, who approved the order, thus overruling Defendant Cox's denial. *Id.* ¶¶ 201-02. However, when the items arrived at Defendant Hestand's office to be distributed, Defendant Cox again stepped in to deny them. *Id.* ¶ 203. Although Defendant Cox initially invoked "security reasons," he later stated that "the Kinni-kinnick was to[o] pure," even though ARs allow Native American practitioners to

have up to 25% tobacco in a blend subject to the authority of the "facility head," Defendant Carson. *Id.* ¶¶ 202, 208-11. Plaintiff proposed an alternative, combining three pre-packaged products from the same vendor which would yield a blend of less than 25% tobacco, which Defendant Carson approved. *Id.* ¶¶ 221-22. However, Defendant Mueller denied that order too because "no one was qualified to mix the prepackaged amounts." *Id.* ¶ 223. Defendants Cox, Hestand, and Mueller never returned Plaintiff's money, and he never received the product. *Id.* ¶ 227.

Finally, Plaintiff alleges that on November 24, 2022, he submitted a request for a preapproved otter fur turban kit comprised of "an Otter fur turban fit, which contained imitation Otter fur, and real Otter fur." *Id.* ¶¶ 231-32. Plaintiff states that "[a]s a Sac & Fox member [he] [is] required to wear an Otter fur turban, a very sacred animal, on [his] head during [his] Sac & Fox Pipe Dance. The Otter will bring [him] secrets of the Fish nation when [he] make[s] prayers with the Pipe for honoring their nation during the dance." *Id.* ¶ 251. Defendants Hestand and Cox refused to approve the order, but after Plaintiff filed a grievance Defendant Hestand eventually relented. *Id.* ¶¶ 235-38. Plaintiff placed the order for the two items, but when they arrived, they were denied as contraband by Defendants Salas, Cox, Hestand, Mueller, and Carson. *Id.* ¶¶ 239-40. Their basis for denial was that the kit would be "homemade" and therefore contraband. *Id.* ¶¶ 242-43. However, other inmates make "homemade" crucifixes and religious items. *Id.* ¶ 244. Plaintiff grieved the denial, and Defendant Griffith eventually responded with Defendant Delarosa's statement that Plaintiff was only allowed to have a black or white cloth turban, though "nowhere in [the relevant Administrative Regulation] does it limit a turban to these restrictions." *Id.* ¶¶ 249-50.

**D.     Claim Four (Mail Censorship and Sexual Activity Policy)**

Claim Four is asserted against CDOC Defendants Griffith, Williams, and Stancil and BCCF Defendants Cox, Mueller, Ensey, Salas, Carson, Brown, and Lewis. *Id.* at 23. Plaintiff asserts that his First, Eighth, and Fourteenth Amendment rights are being violated "in denial of freedom of speech and expression, cruel and unusual punishment in the denial of sexual gratification or consensual close relationships, deliberate indifference to medi[c]al needs in denial of male production of testosterone and denial of publications without due process." *Id.*

Plaintiff also challenges CDOC's AR 300-06, 300-26, and 300-38, which prevent inmates from receiving sexually explicit material through the mail. *Id.* ¶¶ 255-61. Plaintiff claims there is a double standard because he is denied images of nudity but books that describe sexual acts are not similarly censored. *Id.* ¶ 262. He claims that he has had "approximately 350 photos, in 175 different incidents, each costing [him] approximately $.40 each, denied to [him] because of this policy even if the photos were not of an outright violation but even questionable." *Id.* ¶ 277. The CDOC's policy provides that the mailroom will make initial censorship decisions and that, if the decision is challenged, a committee will review the publication and any appeal statements. *Id.* ¶¶ 280 (quoting AR 300-26(IV)(B)(1-2)(d); AR 300-26(IV)(C)(b)-(c)). Plaintiff claims that the mailroom staff (Defendants Brown, Salas, and Lewis) have denied several publications solely on the basis that they were sexually explicit, including various books and manga (graphic novels). *Id.* ¶¶ 291-305.

Plaintiff objects to the procedural due process offered in the ARs, including the fact that mailroom staff also sit on the appeal board that reviews their own decisions. *Id.* ¶

287. He also notes that prior CDOC policy allowed an inmate to appeal the reading committee's decision to the Director of Prisons, but to cut down on the number of appeals, the new AR no longer allowed an automatic appeal and the reading committee's decision became final and could not be grieved. *Id.* ¶¶ 307-10. Plaintiff claims that these procedures deprive him of post-deprivation remedies in violation of the First and Fourteenth Amendments, and he believes that Defendants Brown, Salas, and Lewis "denied [his] publications solely on the grounds that they personally found them offensive" rather than on grounds permitted by the ARs. *Id.* ¶¶ 310, 315.

Plaintiff further asserts that CDOC has a "policy of a complete ban on nudity or sexuality period" that "denies [his] inalienable right to be a sexually active male." *Id.* ¶¶ 317, 328. He claims that this is an Eighth Amendment medical concern because it "has deprived [his] body of male hormones needed as a man for [his] health and well-being, both mental and physical." *Id.* ¶ 334. He claims that the resulting deprivation of testosterone constitutes "a deliberate indifference to [his] health and safety by lowering [his] immune system making [him] more at risk to being infected by diseases." *Id.* ¶¶ 345, 347.

## E.    Relief Sought

Plaintiff seeks declaratory and injunctive relief, including an order commanding Defendants to: (1) allow him to have physical access to legal work on CDOC's computer system during lockdowns; (2) allow him to assemble with his faith group; (3) allow him to obtain religious headgear for his faith; (4) change the policy so he can obtain kinni-kinnick of any purity from an approved vendor; (5) allow nudity in publications; (6) allow conjugal visits; (7) "allow [Plaintiff] to produce testosterone unrestricted"; (8) give him a hearing

"before he is restricted from his privileges for anytime greater than 72 hours"; (9) stop excessive lockdowns; (10) stop using lockdowns as a form of punishment; (11) "stop interpreting AR policies that self-serve the defendants [sic] opinions"; (12) change AR 300-38D to require a greater explanation before denying publications; (13) change AR 300-26 so that individuals who deny incoming publications are not part of the reading committee and cannot oversee appeals from their own denials; (14) allow Plaintiff to participate in the reading committee process by giving him a hearing where he can submit oral argument; (15) change AR 850-04 so that reading committee decisions can be grieved; (16) provide publishers of denied books with detailed denial forms so they can also participate in the appeal process; and (17) "when a publication is denied, that vague or conclusory reasons for the denial can no longer be given." *Id.* at 37-38. Plaintiff also seeks compensatory, nominal, and punitive damages, although he does not link these damages to any particular claim or claims. *Id.* at 39-40.

In the Motions [#34, #37], Defendants seek dismissal of all claims for relief pursuant to Fed. R. Civ. P. 12(b)(6). The Court also sua sponte raises two jurisdictional issues below. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## II. Legal Standards

### A.    Subject Matter Jurisdiction

Because federal courts are tribunals of limited jurisdiction, the Court must establish a statutory basis to exercise jurisdiction. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002). The Court may only exercise jurisdiction "in the presence rather than the absence of statutory authority." *Castaneda v. I.N.S.*, 23 F.3d 1576, 1580 (10th Cir. 1994) (quoting

*Wyeth Lab'ys v. U.S. Dist. Ct.*, 851 F.2d 321, 324 (10th Cir. 1988)). "The party invoking federal jurisdiction has the burden to establish that it is proper, and there is a presumption against its existence." *Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014) (internal quotation marks omitted). The Court "has discretion to consider affidavits and other documents to resolve the jurisdictional question." *Graff v. Aberdeen Enters., II, Inc.*, 65 F.4th 500, 507 (10th Cir. 2023) (citing *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)).

**B.    Fed. R. Civ. P. 12(b)(6)**

Rule 12(b)(6) "tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). "A complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When the complaint has "well-pleaded allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do . . . .  [n]or does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). "[D]ismissal under Rule 12(b)(6) is appropriate if the complaint alone is legally insufficient to state a claim." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104-05 (10th Cir. 2017). However, "[t]he court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial[.]"

*Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).

### III. Analysis

**A.     Subject Matter Jurisdiction**

**1.     Eleventh Amendment Immunity**

"Because Eleventh Amendment immunity is jurisdictional, the Court may consider it *sua sponte*." *White v. Baldridge*, No. 21-cv-02937-NYW-STV, 2022 WL 17751247, at *7 (D. Colo. Dec. 19, 2022) (citation omitted); *see also Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995) ("[The Court] may examine sua sponte whether the Eleventh Amendment bars Plaintiffs' claims.").

The Eleventh Amendment implicates a state's sovereign immunity. *Callahan v. Poppell*, 471 F.3d 1155, 1159-60 (10th Cir. 2006). "The Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state or citizens of another state." *Elephant Butte Irrigation Dist. of N.M. v. Dep't of Interior*, 160 F.3d 602, 607 (10th Cir. 1998). Likewise, the Eleventh Amendment "generally bars suits brought by individuals against state officials acting in their official capacities," but it "does not bar a suit against state officials in their official capacities if it seeks *prospective relief* for the officials' ongoing violation of federal law." *Harris v. Owens*, 264 F.3d 1282, 1289-90 (10th Cir. 2001) (emphasis added). Here, to the extent that Plaintiff seeks retrospective injunctive or declaratory relief and/or monetary damages against Defendants Griffith, Stancil, Delarosa, and Vandyke in their official capacities, those claims are barred by the Eleventh Amendment. *See, e.g.*, *Amin v. Voigtsberger*, 560 F. App'x 780, 782-83 (10th

Cir. 2014) (holding that Colorado officials were entitled to Eleventh Amendment immunity from an inmate's official-capacity claims for money damages).

Accordingly, the Court **recommends** that Plaintiff's claims against Defendants Griffith, Stancil, Delarosa, and Vandyke in their official capacities be **dismissed without prejudice**, in part, to the extent Plaintiff seeks retrospective declaratory or injunctive relief and/or monetary relief from them. *See Rural Water Sewer & Solid Waste Mgmt. v. City of Guthrie*, 654 F.3d 1058, 1069 n.9 (10th Cir. 2011) (stating that "a dismissal on sovereign immunity grounds . . . must be without prejudice").

### 2.    Mootness

The Court may also sua sponte consider whether any of Plaintiff's claims are moot. *See McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996) ("Because mootness is a matter of jurisdiction, a court may raise the issue sua sponte."). When a prisoner sues prison officials at his institution, seeking declaratory and injunctive relief based on their conduct, and then is transferred to another facility, transfer may moot his claims. *Jordan v. Sosa*, 654 F.3d 1012, 1027 (10th Cir. 2011) (citing *Green v. Branson*, 108 F.3d 1296, 1299 (10th Cir. 1997)). Specifically, "[w]here the prisoner's claims for declaratory or injunctive relief relate solely to the conditions of confinement at the penal institution at which the prisoner is no longer incarcerated," courts cannot provide effective relief. *Id.*; *see also Green*, 108 F.3d at 1299-1300 (finding moot prisoner's claims for declaratory and injunctive relief against state officials because he was transferred to federal custody and later released). In other words, granting declaratory or injunctive relief against transferor prison officials would not alter their behavior towards plaintiff if he were no longer in their custody, rendering such claims nonjusticiable. *Green*, 108 F.3d at 1300.

However, when a prisoner challenges "policies that apply in a generally uniform fashion throughout a prison system," courts generally will not find his claims moot following transfer to another prison within that system. *Jordan*, 654 F.3d at 1028. Instead, those claims typically proceed against "defendants who were actually situated to effectuate any prospective relief that the courts may see fit to grant—*viz.*, . . . the director of the prison system or the prison system itself." *Id.*

Here, Plaintiff has been transferred from BCCF to another CDOC facility, SCF. *See Notices of Change of Address* [#7, #53]. To the extent he seeks declaratory or injunctive relief against BCCF officials, *see Am. Compl.* [#10] at 6, 37-38, his claims against them are now moot because he is no longer in their custody. *See Green*, 108 F.3d at 1300. This forecloses any RLUIPA claim against the BCCF Defendants because only prospective injunctive relief is available under the statute. *See Pfeil v. Lampert*, 603 F. App'x 665, 668 (10th Cir. 2015) ("RLUIPA is limited to official capacity claims for [prospective] equitable relief.") (citing *Sossamon v. Texas*, 563 U.S. 277, 280 (2011)); *Stewart v. Beach*, 701 F.3d 1322, 1335 (10th Cir. 2012) (holding that "there is no cause of action under RLUIPA for individual-capacity claims")).

With respect to RLUIPA, this assessment also applies to Defendant Williams, against whom the claim is also asserted, but who is now sued in his individual capacity only, as discussed above. *See Am. Compl.* [#10] at 8, 18; *see also Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) ("Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief.").

Accordingly, the Court **recommends** that Plaintiff's claims against the BCCF Defendants (Cox, Mueller, Garcia, Ensey, Hestand, Salas, Carson, Brown, Lewis, Salazar, Saldana, and Howell) be **dismissed without prejudice**, in part, as moot, to the extent Plaintiff seeks declaratory and/or injunctive relief against them. *See, e.g.*, *Wilkins v. Palomino*, No. 20-cv-03495-PAB-MEH, 2021 WL 4067420, at *3 (D. Colo. Aug. 12, 2021) (sua sponte recommending dismissal without prejudice of prisoner's claims for injunctive relief as moot after his transfer to another prison), *report and recommendation adopted*, 2021 WL 4060635 (D. Colo. Sept. 7, 2021).

The Court further **recommends** that Plaintiff's Claim Three, to the extent asserted under RLUIPA against BCCF Defendants Cox, Mueller, Ensey, Hestand, Salas, and Carson and CDOC Defendant Williams be **dismissed without prejudice** as moot.[12] *See, e.g.*, *Brown v. Buhman*, 822 F.3d 1151, 1165, 1179 (10th Cir. 2016) (explaining that "[m]ootness deprives federal courts of jurisdiction" and therefore requires dismissal without prejudice).

## B.    Fed. R. Civ. P. 12(b)(6)

### 1.    Personal Participation and Supervisory Liability

Before turning to the merits of each of Plaintiff's claims, the Court addresses the parties' arguments relating to personal participation and supervisory liability. "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997). Supervisory status alone does not create § 1983 liability. *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir.

---

[12] The Court addresses below the RLUIPA claim as to CDOC Defendants Griffith, Delarosa, and Stancil, all of whom are sued in both their individual and official capacities. *See Am. Compl.* [#10] at 7-8.

2008). Rather, there must be "an affirmative link" between the constitutional deprivation and either "the supervisor's personal participation, his exercise of control or discretion, or his failure to supervise." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citation omitted).

An "affirmative link" exists where the supervisor has personal involvement in the alleged constitutional violation; there is a sufficient causal connection; and the supervisor acts with a culpable state of mind. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)). Thus, a supervisor may be liable under § 1983 where he or she "creates, promulgates, [or] implements" a policy that deprives plaintiff of his constitutional rights. *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (citation omitted) (alteration in original). However, the Tenth Circuit has "squarely held that a prison official's denial of a grievance cannot create liability under § 1983." *Walker v. Hickenlooper*, 627 F. App'x 710, 715 (10th Cir. 2015).

Here, the CDOC Defendants (Griffith, Jacobson, Williams, Stancil, Delarosa, and Vandyke) argue that Plaintiff has failed to allege their personal participation in any of the alleged constitutional violations, and therefore Plaintiff's claims against them in their individual capacities should be dismissed.[13] *See CDOC Motion* [#34] at 5-15 (examining

---

[13] The BCCF Defendants also raise a personal participation argument, but only in token fashion. *See BCCF Motion* [#37] at 4-5.They argue that, "[i]n analyzing the Plaintiff's allegations, this Court must apply the personal participation requirement to determine if the Plaintiff's specific and non-conclusory allegations establish each individual BCCF Defendant violated Plaintiff's constitutional rights with respect to each of the Plaintiff's different claims." *BCCF Motion* [#37] at 5. However, although they failed to engage in a claim-by-claim, defendant-by-defendant analysis in their own briefing, the Court still considers below as part of its analysis of the merits of each of Plaintiff's four claims whether a defendant's lack of personal participation is clear from the face of Plaintiff's Amended Complaint [#10]. Here, the Court only addresses the argument as raised by the CDOC Defendants, who have thoroughly briefed the issue.

Plaintiff's allegations relevant to each CDOC Defendant). The Court agrees. Although the Amended Complaint [#10] includes no shortage of dates, details, and facts about the BCCF Defendants' conduct, Plaintiff fails to allege that the CDOC Defendants had any *personal* involvement in the alleged violations. In each of Plaintiff's claims, their involvement is strictly limited to denying Plaintiff's grievances, receiving a letter but taking no action (in the case of Defendant Delarosa), and/or promulgating or interpreting CDOC policies, none of which is sufficient when suing these Defendants in their individual capacities, either because the limited allegations against them fail to demonstrate personal involvement or for lack of adequate allegations demonstrating a culpable state of mind to establish their personal participation in the alleged constitutional violations. *See, e.g.*, *Am. Compl.* [#10] ¶¶ 30, 39, 41, 43, 85-88, 93, 95, 116 (allegations under Claim One as to CDOC Defendants Griffith, Jacobson, Williams, Stancil, and Vandyke); *id.* ¶¶ 156-58 (allegations under Claim Two as to CDOC Defendants Griffith and Jacobson); *id.* ¶¶ 181-82, 188, 216, 228-29, 250 (allegations under Claim Three as to Defendants Griffith, Delarosa, Williams, and Stancil); *id.* ¶¶ 255-56, 258, 263, 273, 275-76, 306-11, 317-18, 328-30, 334, 338, 342, 345, 350, 353, 356, 358, 363, 367, 370, 373, 377, 404-05 (allegations under Claim Four as to Defendants Griffith, Williams, and Stancil); *see also Davis v. Ark. Valley Corr. Facility*, 99 F. App'x 838, 843 (10th Cir. 2004) ("Copying [the warden] with correspondence outlining his complaints about medical care, without more, does not sufficiently implicate the warden under § 1983."); *Gallagher*, 587 F.3d at 1069 (holding that denial of a grievance, alone, is insufficient to establish personal participation).

Accordingly, the Court **recommends** that Plaintiff's claims against Defendants Griffith, Jacobson, Williams, Stancil, Delarosa, and Vandyke in their individual capacities be **dismissed without prejudice**.[14] *See, e.g.*, *Reynoldson v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990) (suggesting that, "in light of the permissive standard accorded pro se prisoner pleadings," dismissals for failure to state a claim generally should be without prejudice).[15]

### 2.    Claim One (Access to Courts)

Plaintiff's Claim One is titled "First and Fourteenth Amendment Violations for Denial of Access to Courts" and is asserted against BCCF Defendants Cox, Mueller, Garcia, Ensey, Brown, Salazar, Saldana, and Howell and CDOC Defendants Griffith, Jacobson, Williams, Stancil, and Vandyke.[16] *Am. Compl.* [#10] at 4.

---

[14] The CDOC Defendants (but not the BCCF Defendants) also invoke qualified immunity. *See CDOC Motion* [#34] at 15. Qualified immunity shields government officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted). However, qualified immunity only applies to individual-capacity claims and does not bar official-capacity claims. *Cox*, 800 F.3d at 1239 n.1 (citation omitted). Because Plaintiff has not alleged the CDOC Defendants personally participated in any of his alleged constitutional injuries, they are also entitled to qualified immunity. *See, e.g.*, *Vreeland v. Polis*, No. 20-cv-02420-PAB-SKC, 2023 WL 6160693, at *6 (D. Colo. Sept. 21, 2023) (considering personal participation "under the first prong of qualified immunity"), *8 (finding a defendant "entitled to qualified immunity . . . based on plaintiff's failure to allege any facts in support of [the defendant's] participation in the deprivation of plaintiff's constitutional rights").

[15] CDOC Defendant Jacobson and Williams, who are sued in their individual capacities only, should therefore be dismissed from this lawsuit should this portion of the Recommendation be adopted.

[16] As discussed in Section III.B.1., this claim should be dismissed as to Defendants Jacobson and Williams, who are sued in their individual capacities only, and as to Defendants Griffith, Stancil, and Vandyke in their individual capacities (but not official capacities) for lack of personal participation, but the claim should alternatively be dismissed against them for the reasons described below in this section, which are applicable to all thirteen Defendants named here.

Prisoners have a constitutional right to "meaningful, but not total or unlimited, access to the courts."[17] *Peoples v. CCA Det. Ctrs.*, 422 F.3d 1090, 1107 (10th Cir. 2005). To state a claim for denial of access to courts, a prisoner must demonstrate actual injury. *Lewis v. Casey*, 518 U.S. 343, 349 (1996). The Supreme Court has not established "an abstract, freestanding right to a law library or legal assistance," so "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* at 351. Rather, the inmate must show that alleged shortcomings actually hindered his efforts to pursue a nonfrivolous legal claim. *Id.* For example, he might allege that a complaint "was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known" or that he was "so stymied by inadequacies of the law library that he was unable even to file a complaint." *Id.* Mere conclusory allegations that an inmate has been "unable to pursue pending litigation" because of restricted access to the law library are insufficient to survive dismissal. *Farrell v. Campbell*, 6 F. App'x 830, 832 (10th Cir. 2001) (finding prisoner's "sweeping allegation of actual injury" was too conclusory to state an actual injury) (citing *Twyman v. Crisp*, 584 F.2d 352, 357 (10th Cir. 1978) ("[R]estricted access to the law library is not per se denial of access to the courts.")); *Vreeland v. Schwartz*, 613 F. App'x 679, 683-84 (10th Cir.

---

[17] "The Tenth Circuit variously characterizes court access claims under the First or Fourteenth Amendments. *See, e.g.*, *Vreeland v. Schwartz*, 613 F. App'x 679, 682 (10th Cir. 2015) (discussing state prisoner's "First Amendment right of access to the courts"); *Allen v. Raemisch*, 603 F. App'x 682, 684 (10th Cir. 2015) (same); *but see Penrod v. Zavaras*, 94 F.3d 1399, 1403 (10th Cir. 1996) (stating that "the Fourteenth Amendment . . . guarantees the right of access to the courts"). Any distinction is purely academic and does not affect the Court's analysis, because "[t]he elements of a court access claim, under any source, appear to be uniform." *A.M. v. N.M. Dep't of Health*, 148 F. Supp. 3d 1232, 1280 (D.N.M. 2015) (citing *Christopher v. Harbury*, 536 U.S. 403, 413-16 (2002)).

2015) (rejecting as speculative prisoner's assertion that prison officials denying him access to recordings had unduly hindered his efforts to pursue postconviction relief).

Here, Defendants argue that Plaintiff fails to demonstrate an actual injury, i.e. "that a nonfrivolous legal claim had been frustrated or was being impeded." *See, e.g.*, *BCCF Motion* [#37] at 7-8; *Lewis*, 518 U.S. at 351 (internal footnote omitted). He claims that in *Eaves v. Polis*, No. 21-cv-01269-KAS (D. Colo.), he suffered an injury when he filed a motion seeking an extension of time to file a surreply, "because 'new points were raised by counsel and expressions of beliefs by counsel were made asking for clarifications from Plaintiff.'" *Am. Compl.* [#10] ¶ 19 (quotations in original). The Court "denied an extension and instructed [Plaintiff] to file a 'new motion' to demonstrate 'why a surreply is appropriate in this case . . . if the Court is to permit a surreply.'" *Id.* ¶ 20 (quotation marks in original). Plaintiff believed he only had fourteen days to file that new motion but, "[w]ithout the extension granted to reply, and no access to the law library," he chose to rely only on the arguments in his already-completed surreply. *Id.* ¶¶ 21-22. Ultimately, the Court "struck [Plaintiff's] surreply from the record which left new arguments raised by CDOC in their reply un-responded to and contributed to the dismissal of some of [his] claims." *Id.* ¶ 23. Plaintiff does not explain what arguments were left unaddressed or how they led to dismissal.

The Court may take judicial notice of its own files without converting a motion to dismiss into a summary judgment motion. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). Here, assuming that a filing (rather than a pleading) being struck could constitute an actual injury, Plaintiff admits that the stricken filing related to a surreply he filed without leave of court. *Id.* ¶ 20. The relevant Minute Order [#104] in the *Polis* case

explained that the court had denied Plaintiff's motion for extension of time because he was not entitled to file a surreply as of right, and he was instructed to "*file a motion* demonstrating why a surreply was justified"—but he never did. *See Minute Order* [#104] at 2, in *Eaves v. Polis*, No. 21-cv-01269-KAS (D. Colo. Oct. 13, 2022).

In any case, the *Polis* court did not rule on motions to dismiss for five more months, leaving Plaintiff plenty of time to move for leave to file a surreply. *See Order on Motions to Dismiss* [#106], in *Eaves v. Polis*, No. 21-cv-01269-KAS (D. Colo. Mar. 30, 2023). Plaintiff ultimately filed a motion to reconsider, challenging the court's order on the motions to dismiss, which the court denied. *See Objections to Order* [#114], in *Eaves v. Polis*, No. 21-cv-01269-KAS (D. Colo. Apr. 26, 2023); *Order* [#165], in *Eaves v. Polis*, No. 21-cv-01269-KAS (D. Colo. Jan. 12, 2024). Given that context, Plaintiff fails to plausibly connect the dismissal of certain claims in *Eaves v. Polis* with the striking of his improperly filed surreply, and he fails to plausibly connect the striking of his surreply to any law library restrictions imposed by Defendants. Thus, the alleged injury to Plaintiff's pursuit of claims in *Eaves v. Polis* is attenuated, speculative, and implausible.

Plaintiff's other alleged injuries are even more speculative. First, he vaguely asserts that the Defendants interfered with his ability to file a Rule 35(c) post-conviction motion by imposing law library restrictions following a February 2023 lockdown, but he does not explain how that delay impacted his pursuit of post-conviction relief. *Am. Compl.* [#10] ¶¶ 45-48; *see Vreeland*, 613 F. App'x at 683 (finding that the plaintiff had "failed to adequately allege that he could not properly prepare a petition for postconviction relief without the 'assistance' of direct and unconditional access to the recordings" that prison officials had allegedly withheld).

Next, Plaintiff claims that he was improperly denied two CDs of discovery material from his criminal case, *People v. Eaves*, 15 CR 1188, but he does not explain how that delay impacted his ability to pursue any legal claims, especially since he admits that he later received the CDs. *Am. Compl.* [#10] ¶¶ 96-97, 102-03; *see, e.g.*, *Vreeland*, 613 F. App'x at 683 (finding that the plaintiff "ha[d] not shown how prison restrictions on his access to the recordings would impair his litigation if he ha[d] a nonfrivolous claim"). Finally, Plaintiff states that Defendants had delayed a notice dated July 8, 2021, that "was notifying [him] that [he] had 30 days to have someone come and pick-up the evidence in [his] case or it would be destroyed." *Am. Compl.* [#10] ¶ 104. Again, Plaintiff fails to explain how this allegedly destroyed evidence would have had any bearing on pursuing nonfrivolous legal claims, especially when he later received two CDs of discovery material from the same case.

In summary, Plaintiff fails to state a constitutional claim for denial of access to courts because he has not identified an actual injury to his ability to pursue nonfrivolous legal actions, much less an injury connected to Defendants restricting his access to the law library or changing the terms of the Legal Access Program contract.

Accordingly, the Court **recommends** that Claim One under both the First and Fourteenth Amendments, as asserted against CDOC Defendants Cox, Mueller, Garcia, Ensey, Brown, Salazar, Saldana, and Howell and BCCF Defendants Griffith, Jacobson, Williams, Stancil, and Vandyke, be **dismissed without prejudice**.[18] *See, e.g.*, *Reynoldson*, 907 F.2d at 126.

---

[18] CDOC Defendant Vandyke and BCCF Defendants Garcia, Salazar, Saldana, and Howell are named only in Claim One, and therefore, should this Recommendation be adopted that Claim One be dismissed, these five Defendants should also be dismissed from this lawsuit.

3.    **Claim Two (Excessive Lockdowns)**

Plaintiff claims that BCCF Defendants Cox, Mueller, and Ensey and CDOC Defendants Griffith and Jacobson have violated his First Amendment, Eighth Amendment, and Fourteenth Amendment due process rights by imposing excessive lockdowns.[19] *Am. Compl.* [#10] at 15. Defendants argue that prison officials are empowered to lock down prisons for safety and security reasons without violating inmates' constitutional rights or liberty interests, and that Plaintiff has failed to state a constitutional violation because "according to the Plaintiff, none of the lockdowns lasted more than two weeks or so and all the lockdowns were imposed by prison officials for security reasons."[20] *BCCF Motion* [#37] at 10-11.

a.    **Eighth Amendment**

To state an Eighth Amendment claim for inhumane conditions of confinement in this context, Plaintiff must plausibly allege that Defendants knew of and disregarded an excessive risk that these lockdowns posed to Plaintiff's health or safety. *See May v. Segovia*, No. 15-cv-00405-NYW, 2017 WL 57257, at *5 (D. Colo. Jan. 3, 2017) (regarding lockdowns) (citing *Castillo v. Day*, 790 F.3d 1013, 1017 (10th Cir. 2015)). An Eighth Amendment claim has two components: the objective component "requires that the alleged deprivation be 'sufficiently serious'" while the subjective component "requires the

---

[19] As discussed in Section III.B.1., this claim should be dismissed as to Defendant Jacobson, who is sued in her individual capacity only, and as to Defendant Griffith in his individual capacity (but not official capacity) for lack of personal participation, but the claim should alternatively be dismissed against them for the reasons described below in this section, which are applicable to all five Defendants named here.

[20] As Plaintiff notes, the BCCF Defendants have misread his allegations. *See Response* [#61] at 8. Plaintiff did not allege that no lockdown was longer than "two weeks or so". On the contrary, he alleged that *at least twenty* of the recent lockdowns lasted "two or more weeks" and that proffered security reasons were pretextual. *Am. Compl.* [#10] ¶¶ 126, 155.

jail official to have a 'sufficiently culpable state of mind.'" *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (citation omitted). A deprivation is sufficiently serious if it deprives an inmate of "the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, medical care, and safety. *May*, 2017 WL 57257, at *5 (quoting *Craig*, 164 F.3d at 495). However, "[t]he Eighth Amendment 'does not mandate comfortable prisons,' and conditions imposed may be 'restrictive and even harsh.'" *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998) (citation omitted).

Here, Plaintiff alleges that, during lockdowns, he "lost video visits [his] family paid for, [he] was denied showers, laundry services, commissary, telephone communications (even to [his] attorney), and [his] outgoing mail was not being picked up." *Am. Compl.* [#10] ¶ 127. He was also denied access to the law library, recreation, and religious services. *Id.* Finally, he claims that, during lockdowns, food would frequently sit undelivered for up to three hours—sometimes "dinner would be delivered and lunch was still sitting undelivered"—and it was often served cold. *Id.* ¶¶ 130-31. Drawing all inferences in Plaintiff's favor, he was subjected to at least 40 weeks of lockdowns between October 2021 and November 2023, when he filed his Amended Complaint [#10].

The Court finds that Plaintiff's allegations do not state an Eighth Amendment violation. His concerns about meals being delivered late or cold during lockdown, without more detail, do not demonstrate deprivation of basic necessities. "[G]uidance from this Circuit and others suggests that confining inmates to their cells for twenty-four hours per day or suspending visitation, even for extended durations, does not constitute sufficiently serious deprivations" to state an Eighth Amendment claim. *May*, 2017 WL 57257, at *6 (collecting cases); *see also Reed v. People of the State of Colo.*, No. 16-cv-00405-GPG,

2016 WL 1572544, at *2, 5 (D. Colo. Apr. 19, 2016) (finding that pro se prisoner had failed to state an Eighth Amendment claim based on "conditions of confinement during lockdown, the failure to provide a nutritiously adequate diet, and failure to provide adequate recreation and employment opportunities" arising in part from numerous lockdowns between 2009 and 2015). Thus, Plaintiff has not alleged a sufficiently serious deprivation to satisfy the objective prong of the Eighth Amendment analysis.

Accordingly, the Court **recommends** that Claim Two be **dismissed without prejudice** to the extent asserted under the Eighth Amendment. *See Reynoldson*, 907 F.2d at 126.

### b.    Fourteenth Amendment Due Process

The Supreme Court has recognized that "prisoners do not shed all constitutional rights at the prison gate," but "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." *Sandin v. Conner*, 515 U.S. 472, 485 (1995). To establish a conditions-of-confinement due process violation, a prisoner must demonstrate an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. To determine whether conditions comprise an "atypical and significant hardship," the Tenth Circuit considers factors including: the relationship to a legitimate penological purpose; the conditions of the confinement; the length of the placement; and whether the conditions imposed increase the duration of confinement. *Est. of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007).

However, the Due Process Clause does not "create[] a right for prisoners to leave the area around their cells or to not be subjected to lockdowns," even when the lockdowns

are punitive and are caused by the conduct of other inmates. *Ricks v. Boswell*, 149 F.3d 1191 (table), 1998 WL 339662, at *1 (10th Cir. June 23, 1998) (rejecting prisoner's argument that lockdowns violated the Due Process clause because he had an "inherent right to be free from punishment for acts committed by others"). Thus, "[c]ourts regularly reject claims that 'lockdown' conditions and limited access to amenities violate the Due Process Clause." *Minter v. Lengerich*, No. 20-cv-03205-WJM-STV, 2021 WL 5496388, at *4 (D. Colo. Sept. 29, 2021) (collecting cases), *report and recommendation adopted*, 2021 WL 5494259 (D. Colo. Nov. 23, 2021); *Harris v. Polis*, No. 20-cv-02999-CMA-STV, 2021 WL 3024664, at *5 (D. Colo. June 23, 2021) (collecting cases), *report and recommendation adopted*, 2021 WL 3021466 (D. Colo. July 16, 2021); *see also, e.g.*, *Crawford v. Grote*, No. 22-3084-SAC, 2022 WL 2191774, at *3 (D. Kan. June 16, 2022) (finding that a prisoner's allegation that a prison official placed him on 24-hour lockdown without a hearing, after he had argued with her, failed to state a due process violation). "[G]eneral allegations of restricted liberty, amenities, recreation, visitation, and privileges are conclusory and fail to rise to a condition that is sufficiently atypical or significant in relation to the ordinary incidents of prison life to implicate a liberty interest." *Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1172 (D. Colo. 2010). Finally, violation of an AR does not automatically constitute a violation of a prisoner's liberty interest or due process rights. *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation.").

Here, Plaintiff alleges that Defendants Cox, Mueller, and Ensey violated his Fourteenth Amendment due process rights by imposing lockdowns "for punishment to the prison population for various inciden[t]s" in which Plaintiff had no part. *Am. Compl.* [#10]

¶¶ 135-36. He claims that, before he could be punished for anything, Defendants Cox, Mueller, and Ensey "were 'required' to give [him] 'a formal hearing'" pursuant to AR 150-01(IV)(C). Even assuming Plaintiff's reading of the ARs is correct, he has failed to state a due process claim. He acknowledges that Defendants offered legitimate penological reasons for at least some of the lockdowns—one following a fight involving gang members and another imposed after "too much hooch (homemade alcohol) had been found" in Plaintiff's living unit. *Am. Compl.* [#10] ¶¶ 26-27, 55. Given these admissions, the Court need not credit his conclusory assertion that the lockdowns were motivated to punish him. Plaintiff alleges that "at least 20 lockdowns last[ed] two or more weeks" but does not allege that they were indeterminate in length or increased the overall duration of his confinement. *Id.* ¶ 126; *see Est. of DiMarco*, 473 F.3d at 1342.

The previously cited cases rebut Plaintiff's other arguments. Pursuant to *Ricks*, Plaintiff's non-involvement in the incidents that led to lockdowns does not render those lockdowns constitutionally suspect. *See Ricks*, 1998 WL 339662, at *1. Further, Plaintiff's general allegations of "restricted liberty, amenities, recreation, visitation and privileges" are insufficient to state a claim because, even if true, they do not rise to the level of an atypical or significant condition in relation to the ordinary incidents of prison life. *See Matthews*, 744 F. Supp. 2d at 1172. Finally, Plaintiff cannot bring a due process claim solely based on an alleged violation of the ARs, including AR 150-01(IV)(C). *See Hovater*, 1 F.3d at 1068 n.4; *see also Fogle v. Palomino*, No. 14-cv-00880-KLM, 2014 WL 5800974, at *3 (D. Colo. Nov. 7, 2014) (stating that "[the p]laintiff may not bring a due process claim on the basis of A.R. 150-01 § IV.E.3.t.2" alone).

Accordingly, the Court **recommends** that Claim Two be **dismissed without prejudice** to the extent Plaintiff asserts a Fourteenth Amendment due process claim. *See, e.g.*, *Reynoldson*, 907 F.2d at 126.

### c.    First Amendment

Finally, Plaintiff claims that the lockdowns violated his First Amendment right to freely exercise his religion: specifically, he was "denied access to the only place in the whole facility where [he] [is] allowed to take off [his] boots and walk upon [his] Grandmother so [his] spiritual connection to her can be felt," and he could not "cleanse [his] spirit with sacred smoke." *Am. Compl.* [#10] ¶¶ 146-47. More broadly, he alleges that during these lockdowns he was "denied access to . . . religious services." *Id.* ¶ 127.

Convicted prisoners retain the fundamental right to pursue their religion as guaranteed under the First Amendment's free exercise clause. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1209 (10th Cir. 1999). To state a First Amendment free exercise claim, a prisoner must satisfy a two-part inquiry: First, "[he] must allege facts showing that officials substantially burdened a sincerely held religious belief." *Williams v. Hansen*, 5 F.4th 1129, 1133 (10th Cir. 2021). Next, "prison-official defendants may identify the legitimate penological interests that justified the impinging conduct, and the court must apply a balancing test" to determine whether the regulation was reasonable. *Williams v. Wilkinson*, 645 F. App'x 692, 704 (10th Cir. 2016) (internal quotations and citations omitted). However, "only the first of these inquiries is relevant at the motion-to-dismiss stage." *Id.* Thus, Plaintiff's burden at this stage is not heavy. *Wilkinson*, 645 F. App'x at 704-05 (finding that prisoner's allegation that prison officials denied his request to exercise his sincerely held religious belief was "sufficient to satisfy the first step of a First

Amendment free-exercise inquiry and to survive a Rule 12(b)(6) motion"); *Kay v. Bemis*, 500 F.3d 1214, 1220 (10th Cir. 2007) (finding that the district court had erred in dismissing free-exercise claim even though the plaintiff had not "indicate[d] that the use of tarot cards and other items were 'necessary' to the practice of his religion").

The Tenth Circuit has held that denying access to *all* Native American religious services for an indefinite period, which ultimately lasted just nine days, clearly imposed a substantial burden on a prisoner's religious belief. *Hansen*, 5 F.4th at 1133 (discussing the court's holding in *Yellowbear v. Lampert*, 741 F.3d 48, 56 (10th Cir. 2014)).[21] In *Yellowbear*, prison officials had denied the plaintiff access to a sweat lodge in the general prison yard (which he alleged was necessary to facilitate his religious exercise) because he was housed in a special protective unit due to threats against him. *Yellowbear*, 741 F.3d at 53. This denial was deemed sufficient to satisfy the substantial burden test. *Id.* at 56. In *Hansen,* reviewing the denial of qualified immunity on a motion to dismiss, the Tenth Circuit found that prison officials had violated a Native American prisoner's clearly established First Amendment rights when they "imposed a lockdown and modified operations, including an indefinite suspension of Native American religious services" (though Christian and Muslim services continued) for at least nine days and "imposed a 30-day ban on using tobacco for religious services." *Hansen*, 5 F.4th at 1131, 1135.

Here, Plaintiff alleges that he was subjected to more than 20 lockdowns lasting two weeks or more, impacting two religious practices: he was denied "access to the only place in the whole facility where [he] [is] allowed to take off [his] boots and walk upon [his]

---

[21] Although *Yellowbear* was a RLUIPA case, the *Hansen* court found that it had clearly established the law in the First Amendment context because "anything that constituted a substantial burden under RLUIPA would also have constituted a substantial burden under the First Amendment." *Hansen*, 5 F.4th at 1134.

Grandmother so [his] spiritual connection to her can be felt," and he was prevented from "cleans[ing] his spirit with sacred smoke." *Am. Compl.* [#10] ¶¶ 146-47. However, as pleaded, these allegations are too vague to determine what practices Plaintiff refers to and whether his religious exercise was substantially burdened. For example, Plaintiff's reference to walking upon his Grandmother may refer to the earth or it may refer to something else. Cleansing his spirit with sacred smoke might refer to use of a smoke lodge, use of ceremonial tobacco and herbs during a prayer ceremony, or something else entirely. Plaintiff's allegations here are too vague to state a First Amendment free exercise violation. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (stating that the liberal construction afforded pro se litigants "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based").

Plaintiff vaguely asserts that during these lockdowns he was "denied access to . . . religious services," but he offers no detail as to what specific services were denied as a result of the lockdowns (as opposed to other reasons) or how long such denials lasted. Thus, Plaintiff has not plausibly alleged that he was denied access to *all* Native American religious services for at least nine days, as in *Hansen*, or that he was denied access to a particular service or facility (a smoke lodge) important to his religious exercise, as in *Yellowbear*. The Court acknowledges Plaintiff's pro se status and that this is his first amended complaint, so this may simply be inartful pleading. However, Plaintiff has not stated a free exercise claim relative to the lockdowns.

Accordingly, the Court **recommends** that Plaintiff's Claim Two be **dismissed without prejudice** for failure to state a claim to the extent he alleges a First Amendment free-exercise violation.[22] *See, e.g.*, *Reynoldson*, 907 F.2d at 126.

### 4.    Claim Three (Separation of Faith Circle and Denial of Faith Materials)

Plaintiff asserts "First and Fourteenth Amendment RLUIPA Violations" against BCCF Defendants Cox, Mueller, Ensey, Hestand, Salas, and Carson and CDOC Defendants Griffith, Delarosa, Williams, and Stancil.[23] *Am. Compl.* [#10] at 18. Specifically, he claims that his Native American faith group was separated with no justifiable reason and that he has been denied two faith materials: kinni-kinnick, which he describes as "an herb and tobacco blend smoked during a prayer ceremony," and an otter-fur turban, which is worn "on the head during [his] Sac & Fox Pipe Dance." *Id.* ¶¶ 163-65, 205, 251.

### a.    Fourteenth Amendment Claim

First, to the extent Plaintiff attempts to state a Fourteenth Amendment substantive due process claim under Claim Three, this claim is subsumed into his First Amendment free exercise claim. *See, e.g.*, *Am. Compl.* [#10] ¶¶ 228 (claiming violation of "substantive due process rights under and [Plaintiff's] property rights under the Fourteenth Amendment"), 254 (claiming a violation of his "Fourteenth Amendment Procedur[al] and

---

[22] Thus, because the Court finds that Plaintiff's Claim Two should be dismissed under all three constitutional bases which he asserts, Claim Two should be dismissed in its entirety as to all Defendants named here, i.e., BCCF Defendants Cox, Mueller, and Ensey and CDOC Defendants Griffith and Jacobson. *See Am. Compl.* [#10] at 15.

[23] As discussed in Section III.B.1., this claim should be dismissed as to Defendant Williams, who is sued in his individual capacity only, and as to Defendants Griffith, Delarosa, and Stancil in their individual capacities (but not official capacities) for lack of personal participation.

Substantive Due Process Rights");[24] *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994)

("Where a particular Amendment provides an explicit textual source of constitutional

protection against a particular sort of government behavior, that Amendment, not the

more generalized notion of substantive due process, must be the guide for analyzing

these claims.") (internal quotation marks omitted).

Accordingly, the Court **recommends** that Plaintiff's Claim Three be **dismissed

with prejudice** to the extent he asserts a Fourteenth Amendment substantive due

process claim. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006)

("[D]ismissal with prejudice is appropriate where a complaint fails to state a claim under

Rule 12(b)(6) and granting leave to amend would be futile.").

### b.    First Amendment and RLUIPA

As previously noted, to state a First Amendment claim, Plaintiff "must allege facts

showing that officials substantially burdened a sincerely held religious belief." *Hansen*, 5

F.4th at 1133. To state a claim under RLUIPA, 42 U.S.C. § 2000cc-1, a plaintiff "must

---

[24] Plaintiff's reference to procedural due process rights is woefully undeveloped. "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000). Plaintiff offers no explanation as to how his procedural due process rights may have been violated in connection with Claim Three, and the reference to such rights appears to have been token and merely asserted as part of Plaintiff's "spaghetti-on-the-wall" approach to see what might stick. *See, e.g.*, *Byrnes v. St. Catherine Hosp.*, No. 21-2086-DDC, 2024 WL 4063476, at *9 (D. Kan. Sept. 5, 2024) ("But here plaintiff takes a spaghetti-on-the-wall approach to pretext, rattling off no fewer than 13 theories to see which one will stick."). The Court disregards legal labels made by a pro se plaintiff when those labels serve to confuse the nature of the legal claims asserted. *See Castro v. United States*, 540 U.S. 375, 381 (2003) (noting that it is appropriate for federal courts to ignore legal labels attached to a pro se party's claims "to create a better correspondence between the substance of [the party's claims] and [the] underlying legal basis"). Here, the Court finds that Plaintiff has not adequately asserted a procedural due process claim, and therefore only addresses Plaintiff's First Amendment, Fourteenth Amendment substantive due process, and RLUIPA claims as part of Claim Three. If appropriate, Plaintiff may later seek leave to amend his complaint to clearly state a procedural due process claim.

demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010). This test essentially mirrors the First Amendment free exercise "substantial burden" test. *See Hansen*, 5 F.4th at 1134 (stating that "anything that constituted a substantial burden under RLUIPA would also have constituted a substantial burden under the First Amendment"). The key differences between a First Amendment claim and a RLUIPA claim are (1) "the type of government interest needed to justify a substantial burden," *Hansen*, 5 F.4th at 1133, and (2) that "RLUIPA is limited to official capacity claims for equitable relief," *Pfeil v. Lampert*, 603 F. App'x 665, 668 (10th Cir. 2015). Thus, the RLUIPA claim may not proceed against BCCF Defendants Cox, Mueller, Ensey, Hestand, Williams, Salas, or Carson, who are sued in only their individual capacities, and may only proceed as to CDOC Defendants Griffith, Delarosa, and Stancil to the extent asserted against them in their official capacities.

In Claim Three, Plaintiff identifies three forms of religious exercise allegedly burdened by Defendants: his participation in the faith Circle, *Am. Compl.* [#10] ¶¶ 161-96; obtaining a kinni-kinnick tobacco blend for use in ceremonies, *id.* ¶¶ 197-230; and assembling and wearing a genuine otter fur turban, *id.* ¶¶ 231-54. First, he explains that "to practice prayer ceremonies in Lakota beliefs [he] must be in Circle as a whole and not divided from the group" so that he can be prayed for and pray for others, and he further suggests that his two requests to participate in a Change of Seasons ceremony with the Circle were denied. *Id.* ¶¶ 168, 172-75, 179. As a result, he was "denied . . . from observing [his] holy day as one Circle as required by the faith ten[e]t." *Id.* ¶ 179. Second,

Plaintiff explains that kinni-kinnick is "an herb and tobacco blend smoked during a prayer ceremony" and that "[a] prayer ceremony cannot be conducted without the kinni-kinnick." *Id.* ¶¶ 205, 207. Third and finally, Plaintiff explains that his Sac & Fox religion requires him "to wear an Otter fur turban, a very sacred animal, on the head during [his] Sac & Fox Pipe Dance." *Id.* ¶ 251.

In the Motions [#34, #37], Defendants do not challenge the sincerity of Plaintiff's religious beliefs, nor do they dispute that the faith Circle and these faith items are part of Plaintiff's religious exercise. Further, they do not challenge Plaintiff's assertion that these religious exercises have been substantially burdened by separating Plaintiff from the Circle and by their denial of the two faith materials. The CDOC Defendants briefly suggest that the restriction on kinni-kinnick is not particularly burdensome because CDOC policy "allows Kinni-kinnick from pre-approved sources and prevents unknown herb blends from entering correctional facilities." *CDOC Motion* [#34] at 10. However, Plaintiff has plausibly alleged that the BCCF Defendants interfered with his obtaining kinni-kinnick *notwithstanding* CDOC policy and despite Defendant Hestand's and Defendant Carson's prior approval. *See Am. Compl.* [#10] ¶¶ 197-203. The availability of other alternatives under CDOC policy may be relevant at summary judgment but is not relevant at the motion-to-dismiss stage.

Unlike his Claim Two allegations, Plaintiff's Claim Three allegations are specific and detailed enough for the Court to reasonably infer a substantial burden on his religious practices. He states how the Circle, the kinni-kinnick, and the otter fur turban are significant to his religion and plausibly alleges that he was denied access to them. *See, e.g.*, *Kay*, 500 F.3d at 1220 (reversing district court's dismissal where the prisoner plaintiff

had "sufficiently pleaded his belief in the use of tarot cards and the other requested items for religious purposes was sincerely held"). The Court finds that Plaintiff has met the substantial burden requirement as to all three religious exercises, which is generally all he needs to do to state RLUIPA and First Amendment free-exercise claims at this stage. *See, e.g.*, *Wilkinson*, 645 F. App'x at 704 (stating that only the substantial burden inquiry is relevant at the motion-to-dismiss stage). However, the Court must also consider the proper defendants and requested relief sought in connection with these claims.

### i.    Separation from the Faith Circle

Regarding his separation from the faith Circle at BCCF, Plaintiff alleged that this was done by BCCF Defendants Cox, Mueller, Ensey, Hestand, and Carson without justification. *See Am. Compl.* [#10] ¶¶ 161-80. He alleges that their claims of "security reasons," because "contraband and messages were being passed in all the faith groups," were pretextual. *Id.* ¶¶ 173, 177, 187. Plaintiff claims that in March 2023, Defendant Hestand relayed a message from Defendant Ensey that "if [Plaintiff] attended anymore religious services [he] would receive a COPD charge for failure to follow a direct order." *Id.* ¶¶ 192-95. However, this portion of Claim Three includes no allegations against Defendant Salas, who is also named as part of this claim. *See Am. Compl.* [#10] at 18. Therefore, the Court recommends that the portion of Claim Three related to separation from the Circle under the First Amendment be **dismissed without prejudice** as to **Defendant Salas**, who is sued in her individual capacity only, for lack of personal participation. *See Am. Compl.* [#10] at 8, 18.

Additionally, Plaintiff's Amended Complaint [#10] renders unclear whether he is seeking official-capacity injunctive relief from Defendants Griffith, Stancil, and Delarosa

related to his separation from his faith Circle. To the extent he is, he does not allege that any CDOC policy or custom caused the BCCF Defendants to separate him from his faith Circle. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (stating that "in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law"). Accordingly, the Court **recommends** that the portion of Plaintiff's Claim Three relating to separation from the Circle under both the First Amendment and RLUIPA be **dismissed without prejudice** as to **Defendants Griffith, Stancil, and Delarosa in their official capacities**.[25]

### ii.    Denial of Kinni-kinnick

Plaintiff alleges that on August 11, 2022, he submitted a form "to have some religious materials (Kinni-kinnick) needed for the practice of [his] faith pre-approved by [Defendant] Hestand." *Am. Compl.* [#10] ¶ 197. On August 25, 2022, Defendant Hestand told Plaintiff the items were approved and, on September 26, 2022, Plaintiff placed an order with an approved vendor. *Id.* ¶¶ 198-99. However, when the order arrived, Defendant Cox ordered Defendant Salas to deny it. *Id.* ¶ 200. On October 15, 2022, Plaintiff spoke to Defendant Carson about the denial, and Defendant Carson approved the order over Defendant Cox's denial. *Id.* ¶¶ 201-02. However, when the kinni-kinnick was brought to Defendant Hestand's office to be distributed, Defendant Cox again denied it. *Id.* ¶ 203. Defendant Hestand told Plaintiff that Defendant Cox had denied the kinni-kinnick "because it was to[o] pure" under CDOC regulations. *See id.* ¶¶ 208-10 (citing AR

---

[25] Thus, if this Recommendation is adopted, Plaintiff's Claim Three relating to separation from the Circle survives only to the extent he asserts a First Amendment free exercise claim against Defendants Cox, Mueller, Ensey, Hestand, and Carson, all of whom are sued in their individual capacities only. All aspects of Plaintiff's RLUIPA claim relating to his separation from the Circle will have been dismissed.

800-01 K(A)(1)-(2)). Plaintiff claims that this CDOC policy empowers individuals like Defendants Cox and Hestand to interfere with Plaintiff's ability to pray. *Id.* ¶¶ 212-13. Plaintiff alleges that on January 6, 2023, he approached Defendant Carson with a solution: he would order prepackaged tobacco, burberry leaves, and mint leaves in amounts that, when combined, would result in a 24.7% tobacco mixture. *Id.* ¶¶ 219, 221. Defendant Carson agreed and approved the order. *Id.* ¶ 222. However, after Plaintiff placed the order, on February 10, 2023, Defendant Mueller denied it, "stating no one was qualified to mix the prepackaged amounts." *Id.* ¶ 223. Plaintiff claims that Defendant Cox and Mueller have denied him the ability to pray and that Defendants Cox, Mueller, and Hestand have either destroyed or withheld his order, so he could not receive his money back. *Id.* ¶¶ 225, 227. He asks the Court to order Defendants to "change the policy so [he] can obtain Kinni-kinnick in whatever purity it comes in as long as it comes from an approved vendor." *Id.* at 38.

This section of Plaintiff's Amended Complaint [#10] contains no allegations as to Defendant Ensey. Additionally, Defendant Carson's only alleged involvement was his approval of the order over Defendant Cox's objection and his approval of Plaintiff's proposed compromise. *See Am. Compl.* [#10] ¶¶ 201, 219-22. Thus, even drawing all reasonable inferences in Plaintiff's favor, the Court cannot reasonably infer that Defendant Carson obstructed or interfered with Plaintiff's kinni-kinnick orders in any way. Therefore, the Court **recommends** that the portion of Claim Three related to denial of kinni-kinnick be **dismissed without prejudice** as to **Defendants Ensey and Carson**, who are sued in their individual capacities only, for lack of personal involvement.

Unlike the portion of Claim Three regarding his separation from the faith Circle, Plaintiff partially attributes the First Amendment violation to a CDOC policy that sets a 25% limit on tobacco and allows prison officials to "designate[] appropriate security protocols for receipt and distribution." *Am. Compl.* [#10] ¶¶ 204, 209, 216. He has plausibly alleged that these two policies exist, in the form of ARs. *See Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015) (stating that pleading the existence of a formal or written policy "is easy; the plaintiff can simply allege what the policy is and where it is codified"). Plaintiff has also plausibly alleged that these policies were involved in the decision by Defendants Cox, Mueller, Hestand, and Salas to block his receipt of the kinni-kinnick. There is, therefore, a plausible link between the identified policy and the alleged constitutional violation. *Cf. Graham*, 473 U.S. at 166 (stating that in an official-capacity suit, the entity's policy or custom "must have played a part in the violation of federal law").[26]

### iii.    Denial of Otter-Fur Turban

On November 24, 2022, Plaintiff submitted a request to Defendant Hestand for a preapproved religious item, i.e., an otter-fur turban. *Am. Compl.* [#10] ¶ 231. Defendants Cox and Hestand initially rejected Plaintiff's request, but after Plaintiff filed a grievance on December 22, 2022, Defendant Hestand "responded . . . that [Plaintiff] was now allowed to order [his] Otter fur turban." *Id.* ¶¶ 235-38. However, when the two items arrived, Defendants Salas, Cox, Hestand, Mueller, and Carson denied them as contraband. *Id.* ¶

---

[26] Thus, if this portion of the Recommendation is adopted, Plaintiff's Claim Three relating to denial of kinni-kinnick survives only to the extent that he (1) asserts a First Amendment free exercise claim against Cox, Mueller, Hestand, and Salas, all of whom are sued in their individual capacities only, and (2) seeks injunctive relief under the First Amendment and/or RLUIPA from Defendants Stancil, Griffith, and Delarosa in their official capacities, which are essentially claims against CDOC itself. *See Graham*, 473 U.S. at 165-66.

240. On February 6, 2023, Plaintiff filed another grievance, but this time Defendant Hestand rejected it because "the turban would be 'homemade'" and therefore contraband. *Id.* ¶¶ 242-43. He claims that the otter turban kit was denied even though Plaintiff had complied with "all the appropriate ARs." *Id.* ¶¶ 246-49.

This section of Claim Three includes no allegations about Defendant Ensey. Therefore, the Court **recommends** that the portion of Claim Three related to denial of an otter fur turban be **dismissed without prejudice** as to Defendant Ensey.

Plaintiff's Amended Complaint [#10] renders unclear whether he seeks official-capacity injunctive relief from Defendants Griffith, Stancil, and Delarosa related to the grievance response stating he was only permitted a white or black turban. If he is, he has not plausibly alleged that any CDOC policy or custom played a part in the BCCF Defendants' denial—rather, their denial was based on it being "contraband." *See Graham*, 473 U.S. at 166 (stating that "in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law"). In fact, Plaintiff specifically alleges that CDOC policy (as set forth in AR 800-01) *does not* prevent him from having an otter fur turban. *See Am. Compl.* [#10] ¶ 250 (asserting that "nowhere in AR 800-01 does it limit a turban to these restrictions"). Because Plaintiff has not connected CDOC policy to the alleged denial of his otter fur turban, the Court **recommends** that the portion of Plaintiff's Claim Three related to the otter fur turban be **dismissed without prejudice** as to Defendants Griffith, Stancil, and Delarosa in their official capacities.[27]

---

[27] Thus, if this Recommendation is adopted, Plaintiff's Claim Three relating to denial of an otter fur turban survives only to the extent he asserts a First Amendment free exercise claim against Defendants Carson, Salas, Mueller, Cox, and Hestand, who are sued in their individual capacities only. All aspects of Plaintiff's RLUIPA claim relating to denial of an otter fur turban will have been dismissed.

### 5.    Claim Four (Mail Censorship and Sexual Activity Policy)

Plaintiff's Claim Four asserts First, Eighth, and Fourteenth Amendment due process violations based on CDOC policies regarding (1) inmate access to sexually explicit materials through the mail; and (2) sexual activity. *Am. Compl.* [#10] at 23. This claim is lodged against BCCF Defendants Cox, Mueller, Ensey, Salas, Carson, Brown, and Lewis and CDOC Defendants Griffith, Williams, and Stancil.[28] *Id*. The BCCF Defendants argue that Claim Four fails to state a claim against them, as Plaintiff is challenging CDOC policies. *BCCF Motion* [#37] at 14-17. The CDOC Defendants argue that Plaintiff has failed to state a claim, in part because (1) the CDOC regulations governing sexually explicit material allow for an appeal process and alternate means of expression; (2) CDOC regulations do not prohibit masturbation except when it is done as part of sexual harassment or misconduct; and (3) Plaintiff has failed to plausibly allege that CDOC's sexual activity policy violated his Eighth Amendment rights. *CDOC Motion* [#34] at 11-15.

### a.    First Amendment

Given "the delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment," prisoners' rights can be curtailed in ways that "would raise grave First Amendment concerns outside the prison context." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Accordingly, courts considering the constitutionality of prison regulations, including mail regulations, are instructed to apply

---

[28] As discussed in Section III.B.1., this claim should be dismissed as to Defendant Williams, who is sued in his individual capacity only, and as to Defendants Griffith and Stancil in their individual capacities (but not official capacities) for lack of personal participation.

the four-factor test set forth in *Turner v. Safley*. *See* 482 U.S. 78, 89 (1987) (stating that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests"); *see also Thornburgh*, 490 U.S. at 413 (holding that the *Turner* analysis applies to prison mail regulations).

However, the *Turner* analysis is fact-specific, requiring the court to consider: (1) the relationship between the regulation and the legitimate governmental interest put forward to justify it; (2) whether inmates have access to alternative means of exercising the right; (3) the impact accommodating the right would have on staff, other inmates, and prison resources; and (4) whether obvious, easy alternatives exist that fully accommodate inmates' rights at a de minimis cost. *See Turner*, 482 U.S. at 414-18; *see also Jones v. Salt Lake County*, 503 F.3d 1147, 1153-54, 1163 (10th Cir. 2007) (discussing *Turner* factors on review of summary judgment). Applying these factors, the Tenth Circuit routinely upholds similar prison mail policies *at summary judgment*. *See, e.g.*, *Heard v. Chavez*, 699 F. App'x 788, 791-92 (10th Cir. 2017) (affirming district court's finding that New Mexico prison policy banning sexually explicit material passed constitutional muster after applying the *Turner* factors); *Sperry v. Werholtz*, 413 F. App'x 31, 40-42 (10th Cir. 2011) (finding Kansas prison policy banning sexually explicit materials satisfied the four *Turner* factors); *Jones*, 503 F.3d at 1156 (holding that the Utah "jail's ban on 'sexually explicit material' and 'technical publications' passes constitutional muster"). However, the Court cannot make factual findings under Rule 12(b)(6), which merely "tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). Acknowledging tension between *Turner*'s deferential standard and the *Iqbal*/*Twombly*

plausibility standard, the Tenth Circuit has suggested that a First Amendment challenge to prison mail regulations "must include sufficient facts to indicate the plausibility that the actions of which he complains were *not* reasonably related to legitimate penological interests." *Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir. 2010) (emphasis in original).

Here, Plaintiff alleges that CDOC's prison mail policy banning sexually explicit material "den[ies] [him] freedom of speech and expression that do[es] not serve a governmental interest." *Am. Compl.* [#10] ¶ 255. He argues that the policy has a double standard because sexually explicit images are banned outright while "[p]ublications that only describe sexually explicit content in text [are] not subject to censorship unless it describes and promotes illegal sexual activity (rape, incest, etc…)." *Id.* ¶ 261 (quoting AR 300-26(IV)(B)(1)-(2)(d)). Plaintiff argues that even the ban on sexual imagery is inconsistent, as inmates can watch television or movies that contain nudity. *Id.* ¶ 266.

He alleges that BCCF mailroom staff, i.e., Defendants Brown, Salas, Lewis, and Carson arbitrarily denied several of his publications, including various manga comics and some books. *Id.* ¶¶ 281-305. Plaintiff alleges that a previous CDOC policy allowed inmates to appeal reading committee decisions to the Director of Prisons, but that recently modified ARs "no longer allowed an automatic appeal to the [Director of Prisons] and the reading committee's decision became final and could not even be addressed in a grievance." *Id.* ¶¶ 307, 310 (citing AR 300-26(IV)(A)(4); AR 850-04(IV)(D)(2)(a)). He alleges that Defendants Brown, Salas, Lewis, and Carson have denied some publications for reasons other than those in the policy, such as "stat[ing] that they feel it sexually exploits women" or that "anime cartoons were childish and as grown men we needed to grow up." *Id.* ¶¶ 313, 316. He asks the Court for an injunction commanding Defendants

to: "change AR Form 300-38D so a greater explanation can be given for denied publications"; "change AR 300-26 so individuals who can deny incoming publications cannot sit on the reading committee and oversee appeals for their own denials"; "change AR 850-04 so reading committee decisions can be grieved"; "every time a publication is denied, provide a denied publication form to the publisher"; and "when a publication is denied, that vague or conclusory reasons for the denial can no longer be given." *Id.* at 38.

The Court finds that Plaintiff has plausibly alleged that at least some of the censorship decisions were not reasonably related to legitimate penological interests, but rather were based on mailroom staff's personal distaste, based on conversations Plaintiff purportedly had with Defendants Salas, Brown, Lewis, and Carson. *See Gee*, 627 F.3d at 1188; *see also Am. Compl.* [#10] ¶¶ 313, 316. The Court's finding has no bearing on whether Plaintiff will ultimately prevail at summary judgment after consideration of the *Turner* factors; rather, his First Amendment claim simply is not subject to dismissal at this stage. However, as with Claim Three, the Court must consider the proper defendants.

Claim Four is asserted against BCCF Defendants Cox, Mueller, Ensey, Salas, Carson, Brown, and Lewis, as well as CDOC Defendants Griffith, Williams, and Stancil. *See Am. Compl.* [#10] at 23. The Court construes Plaintiff's Claim Four First Amendment allegations as facially challenging the ARs promulgated by CDOC as well as their application by BCCF Defendants.[29] Plaintiff alleges that Defendants Brown, Salas, Lewis, and Carson were personally involved in denying publications, but he does not allege that Defendants Cox, Mueller, or Ensey engaged in any conduct relevant to this claim.

---

[29] In the Motions [#34, #37], Defendants have not addressed the distinction between facial and as-applied constitutional challenges.

Accordingly, the Court **recommends** that the portion of Claim Four asserting a First Amendment claim be **dismissed without prejudice** as to **Defendants Cox, Mueller, and Ensey**, who are sued only in their individual capacities, for lack of personal participation.[30]

### b.    Fourteenth Amendment Procedural Due Process

Plaintiff argues that AR 300-26 and AR 300-38 create a process that denies him property without due process, specifically publications and incoming mail that are delayed or blocked as sexually explicit. *Am. Compl.* [#10] ¶ 367. He objects to three specific features of the publication review process: first, that a reading committee denial can no longer be grieved; second, that mailroom employees sit on the reading committee that reviews their initial denials; and third, that he is denied "an effective appeal" because the reasons for denial are too vague for him to meaningfully rebut. *Id.* ¶¶ 310, 373, 378. The Court construes this as a procedural due process claim.[31]

The Tenth Circuit has recognized that "both inmates and publishers have a right to procedural due process when publications are rejected." *Jones*, 503 F.3d at 1163.

---

[30] Thus, if this portion of the Recommendation is adopted, Plaintiff's Claim Four under the First Amendment survives only to the extent he seeks injunctive relief from Defendants Stancil and Griffith in their official capacities, and to the extent he seeks monetary relief against Defendants Salas, Carson, Brown, and Lewis in their individual capacities.

[31] In their Reply [#83], the CDOC Defendants argue that this was a new theory of recovery first raised in Plaintiff's Response [#77]. *See Reply* [#83] at 5 (arguing that Plaintiff's "procedural due process claim against Williams and Stancil" in Claim Four was a "new legal theory"). The Court disagrees. Plaintiff's Amended Complaint [#10] included an entire section titled "Publication Procedural Due Process" that raised concerns with the appeal procedures. *See Am. Compl.* [#10] at 32; *see also Surreply* [#87] at 5-6 (arguing that the Amended Complaint [#10] clearly asserted a procedural due process claim). Moreover, Plaintiff clearly took issue with changes in the AR policy that "no longer allowed an automatic appeal to the [Director of Prisons]" and barred grievances for reading committee denials, *Am. Compl.* [#10] ¶ 310, even asking for an injunction forcing CDOC to change those ARs to address these procedural concerns, *id.* at 38. Thus, the Court finds that this claim was not newly raised via briefing.

When a publication is rejected, "the inmate must receive notice, an opportunity to be heard, and an opportunity for appeal to a prison official who was not involved in the original censorship decision." *Smith v. Lawton Corr. Facility Grievance Reviewing Auth.*, No. CIV-18-110-C, 2018 WL 4610887, at *3 (W.D. Okla. Sept. 4, 2018) (citing *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004)); *see also Strope v. Collins*, 492 F. Supp. 2d 1289, 1298 (D. Kan. 2007) (finding that the plaintiffs had been given "all of the procedural due process that is constitutionally required" when they had "an opportunity to grieve those censorships and appeal those decisions to prison officials who were not involved in the original censorship decisions"). To satisfy constitutional minimums of due process, an inmate must be given an opportunity for meaningful review on appeal. *See Jordan v. Sosa*, 577 F. Supp. 2d 1162, 1173 (D. Colo. 2008) (finding a prison regulation unconstitutional "to the extent it permits the institution to return the publication rejected . . . to the publisher prior to completion of the administrative review" because sending the publication back denied inmates any meaningful review on appeal).

In relevant part, AR 300-26 "provides an appeal process; therefore, publication censorship decisions may not be grieved," but "[d]isputes related to procedural errors may be addressed through the grievance process." *See CDOC Movants' Appendix* [#34-1] at 2 (AR 300-26(IV)(A)(4)). The mailroom makes initial censorship decisions on all incoming publications and "will notify each affected offender within 48 hours from the date the item is received in the facility mailroom." *Id.* at 2, 4 (AR 300-26(IV)(B)(1), (5)(b)). The mailroom is also directed to send notice to publishers. *Id.* at 4 (AR 300-26(IV)(B)(5)(c)). The facility publication review committee reviews publications that are referred to it, and it "must review the publication and all appeal statements received." *Id.* (AR 300-26(IV)(C)). Within

fourteen days of the publication review committee's recommendation, the administrative head is directed to review the recommendation, the publication, and any statements to determine whether to permit or censor the publication and to determine whether to permit an appeal to the "director of Prisons." *Id.* at 5 (AR 300-26(IV)(C)(7)). The committee is to be comprised of "the facility general library technician/librarian, and at least one representative from each of the following areas: Programs, Custody/Control, Intelligence Office, Behavioral Health, and may include other persons deemed appropriate." *Id.* at 1 (AR 300-26(III)(D)).

As described by Plaintiff and in AR 300-26(IV), the appeals process provides Plaintiff with some notice and opportunity to be heard when a publication is rejected. To the extent Plaintiff objects to the sufficiency of notice to publishers of rejected material, he does not explain how he has standing to pursue relief on behalf of these unidentified non-parties. Nor is the Court persuaded that the alleged vagueness associated with rejecting a publication as "sexually explicit material pursuant to AR 300-26" presents a constitutional concern. *Am. Compl.* [#10] ¶ 372. Plaintiff admits that the regulation defines the term "sexually explicit content" by reference to several specific body parts and several specific activities. *Id.* ¶ 260 (citing AR 300-26(III)(H)). Given that the AR specifically and narrowly defines "sexually explicit content," Plaintiff does not explain how mailroom staff's reference to that definition is too vague for him to meaningfully appeal.

However, the Court finds that Plaintiff has stated two procedural due process claims: one based on his allegation that mailroom staff (Defendants Brown, Lewis, and Salas) make initial censorship determinations and then sit on the review board, where they review their own decisions; and the other based on his allegation that the new AR

does not allow rejections to be grieved. *See, e.g.*, *Am. Compl.* [#10] ¶ 379. To the extent that Plaintiff is not provided an opportunity to grieve these decisions or otherwise "appeal those decisions to prison officials who were not involved in the original censorship decisions," he has plausibly alleged that he is not being given a meaningful opportunity for review. *See Strope*, 492 F. Supp. 2d at 1298; *see also Smith*, 2018 WL 4610887, at *3 (stating that, when a publication is rejected, "the inmate must receive notice, an opportunity to be heard, and an opportunity for appeal to a prison official who was not involved in the original censorship decision") (citing *Jacklovich*, 392 F.3d at 433). In sum, Plaintiff has plausibly alleged that the procedures set forth in AR 300-26(IV), as applied at BCCF, denied him meaningful review on appeal from the mailroom's rejection of his publications. *See Jordan*, 577 F. Supp. 2d at 1173 (explaining that a process that "denies meaningful review on appeal, denies due process to plaintiff").

Both sets of Defendants are involved in this alleged due process violation. CDOC modified its ARs to significantly limit review of reading committee denials (through either appeal or grievance), while BCCF applied the ARs in a way that allowed mailroom staff (Defendants Brown, Lewis, and Salas) to sit on the appeal board that reviewed their own decisions. Therefore, the Court recommends that Plaintiff's Claim Four for procedural due process be permitted to proceed to the extent he alleges (1) that the reading committee includes mailroom staff (Defendants Brown, Lewis, and Salas) who review their own censorship decisions; and (2) that he is not permitted to grieve reading committee denials. This includes Plaintiff's claims for injunctive relief against Defendants Stancil and Griffith in their official capacities relative to AR 300-26(IV) and 850-04(IV)(E)(1) and against

Defendants Brown, Lewis, Salas, and Carson in their individual capacities for alleged past

violations of his Fourteenth Amendment procedural due process rights.

### c.    Fourteenth Amendment Substantive Due Process

Plaintiff also claims that the review process set forth in AR 300-26 violates his

substantive due process rights. *Am. Compl.* [#10] ¶¶ 375, 379-80. However, this claim is

subsumed into his First Amendment claim. *See CDOC Motion* [#34] at 11 & 11 n.4

(arguing that Claim Four arises only under the First and Eighth, not the Fourteenth

Amendment); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular

Amendment provides an explicit textual source of constitutional protection against a

particular sort of government behavior, that Amendment, not the more generalized notion

of substantive due process, must be the guide for analyzing these claims.") (internal

quotation marks omitted).

Accordingly, the Court **recommends** that Plaintiff's Claim Four be **dismissed with**

**prejudice** to the extent he asserts a Fourteenth Amendment substantive due process

violation. *See Brereton*, 434 F.3d at 1219.

### d.    Eighth Amendment Deliberate Indifference

Finally, Plaintiff asserts that CDOC has two policies which "den[y] [his] inalienable

right to be a sexually active male," namely AR 100-40A and 150-01(IV)(E)(21a)(e). *Am.*

*Compl.* [#10] ¶ 317. He characterizes these policies as "a complete ban on nudity or

sexuality period," and he alleges that, due to these policies, he "lost a sixteen-year

marriage after four years of incarceration because in visits [he] [is] not allowed to kiss

[his] wife, [he and his wife] cannot send or receive nude photos or videos to each other

and with the loss of intimacy with her in [their] marriage, it eventually withered and died."

*Id.* ¶ 329. Plaintiff further alleges that, if he is caught masturbating, he "will receive a C.O.P.D. charge and have to register as a sex offender." *Id.* ¶ 347 (citing AR 150-01(IV)(E)(21a)(e)). Plaintiff claims that he now suffers from erectile dysfunction and has not been touched by another person, except for pat searches, in eight years. *Id.* ¶ 330. He asserts that these policies have "deprived [his] body of male hor[]mones needed as a man for [his] health and well-being[.]" *Id.* ¶ 334. He frames this as an Eighth Amendment claim of "Deliberate Indifference to Medi[c]al Needs." *Id.* at 23.

Prison officials violate the Eighth Amendment when they act with "deliberate indifference to an inmate's serious medical needs." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). The objective component requires a prisoner to show that his medical need was "sufficiently serious," i.e., a condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Est. of Beauford v. Mesa County, Colo.*, 35 F.4th 1248, 1262 (10th Cir. 2022) (citations omitted). Substantial harm may be satisfied by "lifelong handicap, permanent loss, or considerable pain." *Id.* (citation omitted). As for the subjective prong, the plaintiff must show that the prison official acted with "deliberate indifference," meaning that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Here, at the outset, the Court generally agrees with the CDOC Defendants that Plaintiff is misreading AR 100-40 and AR 150-01(IV)(E)(21a). *See CDOC Motion* [#34] at 13 (arguing that "[n]either policy bans masturbation in prisons" except "in the context of

sexual harassment"); *see also CDOC Movants' Appendix* [#34-1] at 42 (AR 100-40), 69 (AR Form 100-40A), 95 (AR 150-01(IV)(E)(21a)). However, even if the Court accepts Plaintiff's interpretation, he has failed to state an Eighth Amendment deliberate indifference claim because he has not alleged a "sufficiently serious" medical need. He does not claim that he has been diagnosed by a physician with any condition linked to these regulations, nor is the link between these regulations and Plaintiff's mental and physical health concerns "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). Absent any alleged diagnosis or treatment, fears of long-term harm are speculative and unsupported by non-conclusory allegations.

Accordingly, the Court **recommends** that Claim Four be **dismissed without prejudice** to the extent Plaintiff alleges an Eighth Amendment claim, for failure to state a claim under the objective prong of deliberate indifference to medical needs.

### IV. Conclusion

Based on the foregoing,

IT IS HEREBY **RECOMMENDED** that the CDOC Motion [#34] be **GRANTED in part** and **DENIED in part** and that the BCCF Motion [#37] be **GRANTED in part** and **DENIED in part** as follows:

IT IS FURTHER **RECOMMENDED** that Plaintiff's official-capacity claims against Defendants Griffith, Stancil, Delarosa, and Vandyke be **DISMISSED without prejudice** to the extent he seeks retrospective, monetary, or declaratory relief, based on Eleventh Amendment immunity.

IT IS FURTHER **RECOMMENDED** that Plaintiff's claims for declaratory or injunctive relief against the BCCF Defendants (Defendants Cox, Mueller, Garcia, Ensey, Hestand, Salas, Carson, Brown, Lewis, Salazar, Saldana, and Howell)—including his RLUIPA claim against these Defendants and Defendant Williams—be **DISMISSED without prejudice** as moot.

IT IS FURTHER **RECOMMENDED** that Plaintiff's individual-capacity claims against the CDOC Defendants (Defendants Griffith, Jacobson, Williams, Stancil, Delarosa, and Vandyke) be **DISMISSED without prejudice** for lack of personal participation.

IT IS FURTHER **RECOMMENDED** that Plaintiff's Claim One (Denial of Access to Courts) and Claim Two (Excessive Lockdowns) be **DISMISSED without prejudice** in full.

### Claim One (Access to Courts)

IT IS FURTHER RECOMMENDED that Claim One under both the First and Fourteenth Amendments, as asserted against **CDOC Defendants Cox, Mueller, Garcia, Ensey, Brown, Salazar, Saldana, and Howell** and **BCCF Defendants Griffith, Jacobson, Williams, Stancil, and Vandyke**, be **DISMISSED without prejudice.** (Because CDOC Defendant Vandyke and BCCF Defendants Garcia, Salazar, Saldana, and Howell are named only Claim One, these five Defendants would be dismissed from this lawsuit if this Recommendation is adopted.)

### Claim Two (Excessive Lockdowns)

IT IS FURTHER RECOMMENDED that Claim Two be **dismissed without prejudice** to the extent asserted under the Eighth Amendment.

IT IS FURTHER RECOMMENDED that Claim Two be **dismissed without prejudice** to the extent Plaintiff asserts a Fourteenth Amendment due process claim.

### Claim Three (Separation of Faith Circle and Denial of Faith Materials)

IT IS FURTHER RECOMMENDED that Claim Three be **dismissed with prejudice** to the extent he asserts a Fourteenth Amendment substantive due process claim.

IT IS FURTHER RECOMMENDED that the portion of Claim Three related to separation from the faith Circle under the First Amendment be **dismissed without prejudice** as to **Defendant Salas**, who is sued in her individual capacity only, for lack of personal participation.

IT IS FURTHER RECOMMENDED that the portion of Claim Three that the portion of Plaintiff's Claim Three relating to separation from the Circle under both the First Amendment and RLUIPA be **dismissed without prejudice** as to **Defendants Griffith, Stancil, and Delarosa in their official capacities.** (Plaintiff's Claim Three relating to separation from the faith Circle would survive only to the extent Plaintiff asserts a First Amendment free exercise claim against Defendants Cox, Mueller, Ensey, Hestand, and Carson, all of whom are sued in their individual capacities only. All aspects of Plaintiff's RLUIPA claim relating to his separation from the faith Circle will have been dismissed.)

IT IS FURTHER RECOMMENDED that the portion of Claim Three related to denial of kinni-kinnick be **dismissed without prejudice** as to **Defendants Ensey and Carson**, who are sued in their individual capacities only, for lack of personal involvement.

IT IS FURTHER RECOMMENDED that the portion of Claim Three related to denial of an otter fur turban be **dismissed without prejudice** as to **Defendant Ensey**.

IT IS FURTHER RECOMMENDED that the portion of Claim Three that the portion of Plaintiff's Claim Three related to the otter fur turban be **dismissed without prejudice** as to **Defendants Griffith, Stancil, and Delarosa in their official capacities**. (Plaintiff's Claim Three relating to denial of an otter fur turban would survive only to the extent he asserts a First Amendment free exercise claim against Defendants Carson, Salas, Mueller, Cox, and Hestand, who are sued in their individual capacities only. All aspects of Plaintiff's RLUIPA claim relating to denial of an otter fur turban will have been dismissed.)

### Claim Four (Mail Censorship and Sexual Activity Policy)

IT IS FURTHER RECOMMENDED that the portion of Claim Four asserting a First Amendment claim be **dismissed without prejudice** as to **Defendants Cox, Mueller, and Ensey**, who are sued only in their individual capacities, for lack of personal participation. (Plaintiff's Claim Four under the First Amendment [facial and applied-challenge] would survive only to the extent he seeks injunctive relief from Defendants Stancil and Griffith in their official capacities, and to the extent he seeks monetary relief against Defendants Salas, Carson, Brown, and Lewis in their individual capacities.)

IT IS FURTHER RECOMMENDED that Plaintiff's Claim Four be **dismissed with prejudice** to the extent Plaintiff asserts a Fourteenth Amendment substantive due process violation.

IT IS FURTHER RECOMMENDED that Claim Four be **dismissed without prejudice** to the extent Plaintiff alleges an Eighth Amendment claim, for failure to state a claim under the objective prong of deliberate indifference to medical needs.

IT IS FURTHER **RECOMMENDED** that **Defendants Jacobson, Williams, Garcia, Salazar, Saldana, Howell, and Vandyke** be **DISMISSED** from this lawsuit.[32]

IT IS FURTHER **ORDERED** that any party may file objections **within 14 days** of service of this Recommendation. In relevant part, Fed. R. Civ. P. 72(b)(2) provides that, "within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996). The objection must be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute." *Id.* "[A]

---

[32] If this Recommendation is adopted in full, the following claims will remain:

**(1)** Claim Three, asserting First Amendment free-exercise claims relating to **(a)** separation from the faith Circle, against Defendants Cox, Mueller, Ensey, Hestand, and Carson, in their individual capacities only; **(b)** denial of kinni-kinnick, against Defendants Cox, Mueller, Hestand, and Salas in their individual capacities only; and **(c)** denial of an otter fur turban, against Defendants Cox, Hestand, Carson, Salas, and Mueller in their individual capacities only;

**(2)** Claim Three, asserting RLUIPA claims for injunctive relief against Defendants Stancil, Griffith, and Delarosa, in their official capacities only, relating to CDOC's tobacco purity policy;

**(3)** Claim Four, asserting a First Amendment free expression claim against Defendants Brown, Lewis, Salas, and Carson, in their individual capacities only, and against Defendants Stancil and Griffith, in their official capacities only; and

**(4)** Claim Four, asserting a Fourteenth Amendment procedural due process claim against Brown, Lewis, Salas, and Carson, in their individual capacities only, and against Defendants Stancil and Griffith, in their official capacities only, specific to **(a)** mailroom staff sitting on the review committee; and **(b)** the review committee's decision not being grievable.

Thus, the remaining Defendants would be Defendants Cox, Mueller, Ensey, Hestand, Salas, Carson, Lewis, and Brown, in their individual capacities only, and Defendants Stancil, Griffith, and Delarosa, in their official capacities only.

party who fails to make a timely objection to the magistrate judge's findings and recommendations waives appellate review of both factual and legal questions." *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated: March 2, 2025                                BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge